[No. 60999-3. En Banc. August 18, 1994.]

JAMES DAVID WRIGHT, SR., *as Personal Representative, Appellant,* v. RAYMOND ENGUM, ET AL, *Respondents.*

*The Davis Firm,* by *Susan R. Davis* and *Donald K. Davis,* for appellant.

*Helsell, Fetterman, Martin, Todd & Hokanson,* by *Jerry E. Thonn* and *Robert N. Gellatly,* for respondents.

MADSEN, J. — On February 22, 1989, Theresa McKee, a blind pedestrian, was struck and killed by a truck driven by Defendant Raymond Engum and owned by Defendant Pro Express, Inc. In this case, Plaintiff James David Wright, Sr., as personal representative for the estate of Theresa McKee, appeals a King County Superior Court verdict holding that the Defendants were not negligent. This court accepted certification from the Court of Appeals and now affirms the jury verdict.

## FACTS

The accident occurred at approximately 2:30 p.m. at the intersection of Dexter Avenue North and Roy Street in Seattle, Washington. Defendant Engum, a 62-year-old Pro Express employee with over 35 years of experience, was driving a 1979 Ford 80,000-pound-capacity tractor/trailer with a 45-foot trailer. He had just delivered a load of fertilizer to the Seattle Parks Department about a block from the accident site. Engum was stopped at a flashing red light and was pointed west on Roy Street. At this location, Dexter has three northbound lanes and two southbound lanes separated by a double yellow line. The outside northbound lane of Dexter is normally used for parking. The traffic on Dexter is controlled by a flashing yellow light. Engum intended to make a right turn and proceed north on Dexter. He made a complete stop, turned on his right turn signal, and waited for traffic on Dexter to clear. While stopped, he noticed a female pedestrian, McKee, standing to his right on the northeast corner of Roy and Dexter. She was near the curb, her body was facing west, but she was looking over her left

shoulder directly at Engum's truck. Engum could see her left side. She was wearing a pair of blue jeans, a jacket, a head scarf, and dark sunglasses. According to Engum, it appeared that McKee was waiting to cross Dexter; however, she made no attempt to do so. Instead, she remained on the sidewalk, looking over her left shoulder at Engum's truck. He checked traffic in the northbound and southbound lanes and then looked again at McKee. She made no attempt to cross the street. Believing that McKee was waiting for him to turn right before she crossed the street, Engum released the air brakes, let out the clutch, and drove forward into the intersection. Because of the length of the truck, Engum drove out into the intersection before beginning his right turn in order to avoid running over the curb with the trailer. As he turned, a portion of the truck was actually in a southbound lane. About three-quarters of the way through the turn, he felt a bump and thought he had run over a "turtle" dividing north and southbound lanes. He looked in his mirror and saw the turtles, but could not determine how he could have hit them. As Engum straightened out the truck, he looked again in his mirror and saw McKee's body lying in the street between the second and third northbound lanes.

After he approached the body, Engum noticed a white cane on the road beside the body. He testified that he did not see the cane before the accident and made "no connection with her being blind or needing a white cane at the time when she was standing on the corner". Report of Proceedings, at 359. According to her father, McKee had owned a collapsible cane which she used when she was unsure of the terrain she was negotiating, but not at all times. McKee was able to see large objects as blurry forms and was capable of traveling on her own. There were no additional witnesses to the accident. Police officers investigating the accident offered the opinion that the impact occurred near the back of the gas tank on the right rear side of the truck about 10 feet from the front and about 18 to 20 feet from the curb. The police later examined the truck and found it in good working order.

Plaintiff brought suit for negligence and also claimed that Defendants were strictly liable under the State White Cane Law, RCW 70.84.040. Defendants alleged comparative negligence on the part of the Plaintiff and also argued that the statute did not create strict liability. At trial, Plaintiff moved for a directed verdict asserting that, under Washington's White Cane Law, drivers involved in accidents with blind pedestrians are held strictly liable. The court denied the motion, holding that a driver involved in a collision with a blind pedestrian is liable under the terms of RCW 70.84.040 only if the driver knew, or reasonably should have known, that the pedestrian was blind.

Both sides presented expert testimony regarding the amount of time that McKee was visible to Engum while he was turning his truck. The jury found for the Defendants. Plaintiff moved for a judgment notwithstanding the verdict (JNOV) which the court again denied. Plaintiff then filed a timely appeal to the Court of Appeals and this court accepted certification.

In this appeal, Plaintiff asserts that RCW 70.84.040 imposes strict liability and that the trial court erred by instructing the jury that it must find that the Defendant either saw, or in the exercise of ordinary care should have seen, Theresa McKee carrying the white cane in the street. Plaintiff also argues that the trial court erred in denying his motions for a directed verdict and a JNOV under both strict liability and negligence theories.

### ANALYSIS

Plaintiff first challenges the trial court's instruction regarding notice. Instruction 14 and substitute instruction 14 advised that in order to find liability the jury must find that Mr. Engum either saw or, in the exercise of ordinary care, should have seen Theresa McKee carrying the white cane in the street. Plaintiff asserts that RCW 70.84.040 holds motorists who injure blind pedestrians strictly liable and that negligence concepts such as notice and ordinary care are inapplicable.

RCW 70.84.040, the relevant portion of Washington's White Cane Law, provides:

> The driver of a vehicle approaching a totally or partially blind pedestrian who is carrying a cane predominantly white in color (with or without a red tip), a totally or partially blind or hearing impaired pedestrian using a guide dog, or an otherwise physically disabled person using a service dog shall take all necessary precautions to avoid injury to such pedestrian. Any driver who fails to take such precaution shall be liable in damages for any injury caused such pedestrian. It shall be unlawful for the operator of any vehicle to drive into or upon any crosswalk while there is on such crosswalk, such pedestrian, crossing or attempting to cross the roadway, if such pedestrian indicates his intention to cross or of continuing on, with a timely warning by holding up or waving a white cane, using a guide dog, or using a service dog. The failure of any such pedestrian so to signal shall not deprive him of the right of way accorded him by other laws.

RCW 70.84.040 was adopted in two parts. The first part charges drivers encountering blind pedestrians with an enhanced duty of care — the duty to take "all necessary precautions". RCW 70.84.040. The statute directs that drivers who fail to exercise this enhanced care and thereby cause injury to a blind pedestrian "shall be liable" in damages. RCW 70.84.040. The Legislature added the first part of the current statute in 1969 as an additional protection for blind pedestrians. Laws of 1969, ch. 141, § 4. This enhanced protection is triggered by the presence of a person carrying a white cane or in the company of a guide dog. The statute provides that the blind pedestrian carry "a cane predominantly white in color" or use a guide dog. RCW 70.84.040.

The second part of the statute is the original statute adopted in 1945. Laws of 1945, ch. 105, §§ 1, 2. This part of the statute makes it unlawful to enter a crosswalk if a blind pedestrian "indicates his intention to cross" by waving a white cane or by using a guide dog. RCW 70.84.040. In the absence of a signal from the blind pedestrian a driver may proceed, held only to the standard of care described in the first part of the statute. While failure of the blind person to signal deprives that person of the "extra" right of way, the blind person will have the right of way accorded sighted

persons. For example, if a "walk" signal grants pedestrians the right of way at an intersection, a blind pedestrian's failure to wave his or her white cane "shall not deprive" the pedestrian of the right of way granted by the signal. RCW 70.84.040. The Plaintiff contends that the Legislature intended to impose strict liability when it adopted the 1969 amendment.

Washington courts will not construe a statute to impose strict liability absent a clear indication that the Legislature intended to do so. *Hyatt v. Sellen Constr. Co.*, 40 Wn. App. 893, 897, 700 P.2d 1164 (1985). In support of his position, the Plaintiff points to the statutory language that drivers who fail to take "all necessary precautions" "shall be liable" in damages. RCW 70.84.040. This, he contends, is similar to language used in other Washington statutes that have been construed to hold violators strictly liable regardless of notice. Specifically, Plaintiff cites RCW 16.08.040 which provides that the dog owner "shall be liable" when the owner's dog bites a person lawfully present on the property. This statute has been construed to create "statutory strict liability". *Beeler v. Hickman*, 50 Wn. App. 746, 751-52, 750 P.2d 1282 (1988). Unlike RCW 70.84.040, however, RCW 16.08.040 addresses the issue of knowledge, stating that the owner is liable "regardless" of the "owner's knowledge of such viciousness". RCW 16.08.040. The *Beeler* court noted that, by dispensing with the knowledge requirement, the statute was in derogation of common law. The court explained that this interpretation was mandated by the express language of the statute. *Beeler*, at 751-52 (citing *McNeal v. Allen*, 95 Wn.2d 265, 269, 621 P.2d 1285 (1980)). No such express language exists in RCW 70.84.040.

Plaintiff also points to RCW 81.29.020 which provides that common carriers "shall be liable" for "any loss, damage or injury to [property transported] caused by [the common carrier]" and which this court has held creates strict liability. *Albrecht v. Groat*, 91 Wn.2d 257, 259, 588 P.2d 229 (1978). In *Albrecht*, this court explained that acceptance of property to be transported imposes strict duty on the common carrier to

" 'exercise *such care as is required to protect that property from loss or injury during the transportation.' " *Albrecht*, at 259 (quoting *McCurdy v. Union Pac. R.R.*, 68 Wn.2d 457, 462, 413 P.2d 617 (1966)). Plaintiffs reliance on the common carrier statute is also misplaced. Unlike a driver, the common carrier is on notice of its enhanced duty whenever it accepts a package for delivery. The same cannot be said for the motorist who might unexpectedly encounter a blind pedestrian on a street corner.

Plaintiff also presents the court with a colloquy between two of the legislation's sponsors which Plaintiff argues evidences an intent to hold drivers strictly liable regardless of their awareness of the pedestrian's disability. This colloquy occurred on the Senate floor on February 21, 1969, as the Senate considered the standard of care imposed under the statute.

Senator Mardesich: "Mr. President, I realize this is somewhat out of order but before we leave the second reading order I would like to ask one of the sponsors of the bill whether or not it might not be wise to define what 'blind' is; and secondly, whether new section 4 would apply in the case of a situation where there was a blind person who stepped off the sidewalk into a crosswalk and there is a traffic control light indicating that the cars could pass through, if the driver of the vehicle would automatically be liable under new section 4 and I wonder if the sponsors want to go as far as they are going here?"

Senator Connor: "Section 4 and 5 gives [*sic*] the right of way to the blind person crossing the street. The right is extended even though the blind person shall not signal with his cane. Now this is what the 'White Cane' people wanted. They have this law passed in several states, I believe Michigan and Wisconsin."

Senator Peterson (Ted): "Continuing on a little further on Senator Mardesich's inquiry, I just want to say that if they have the white cane or if they have the guide dog, and the motorist ran into them, they would be liable. If the blind person started crossing the intersection against the light without the indicated white cane or the guide dog, then the motorist would not be liable. In this bill you have two indications on this, the all white cane means totally blind, if the cane is half white and half red, then he is partially blind but the indications would be on the cane or the fact that he had a dog which would mean that he was totally blind."

Senate Journal, 41st Legislature (1969), at 325. Plaintiff suggests that this discussion evidences an intent to hold drivers liable even if the visually handicapped pedestrian violated what would otherwise be the motorist's right of way. While this may be true in that a driver owes a pedestrian carrying a white cane an enhanced duty of care even where the motorist has the right of way, it is not evidence of an intent to impose liability absent some indication that the pedestrian is blind as evidenced by use of a cane or guide dog.

Moreover, this colloquy does little to advance Plaintiff's argument. The legislators engaged in considerable discussion regarding the import of a white cane and a guide dog in relation to the level of impairment of a blind pedestrian. This colloquy implies that the Senators were concerned with notice to the driver. It certainly does not evidence the clear legislative intent required to impose strict liability regardless of notice. *Hyatt v. Sellen Constr. Co.*, 40 Wn. App. 893, 897, 700 P.2d 1164 (1985). It is also apparent from the exchange that the White Cane Law was adopted to bring Washington into line with other states which had passed similar legislation. The colloquy does not support the proposition that the Washington Legislature intended to adopt a white cane law significantly different from that in other states.[1]

Although it is clear that when it adopted the 1969 amendment the Legislature intended to enhance protection for blind pedestrians, we disagree that this enhanced protection was intended regardless of whether a motorist was aware of the pedestrians' impairment. As a rule of statutory interpretation, courts construe statutes to avoid "absurd or strained consequences". *In re Eaton*, 110 Wn.2d 892, 901,

---

[1]Forty-three states extend protection through white cane laws to wholly, totally, or partially blind persons while an additional five states extend only to blind persons. In 18 states the cane-using blind person must carry or use the cane to comply with the statute's conditions while 26 states require the cane to be raised or extended. Thirty-seven states permit the use of guide dogs in the alternative. Thirty-four states require the motorist to take such precautions as may be necessary to avoid accident or injury to the pedestrian. Nine states require reasonable care to avoid injury. Jacobus tenBroek, *The Right To Live in the World: The Disabled in the Law of Torts*, 54 Cal. L. Rev. 841, 905-10 (1966).

757 P.2d 961 (1988). Moreover, courts should read the statute as a whole, considering all provisions in relation to each other and giving effect to each provision. *Nisqually Delta Ass'n v. DuPont*, 103 Wn.2d 720, 730, 696 P.2d 1222 (1985). Reading both parts of the statute together, we conclude that the Legislature has provided enhanced protection for blind pedestrians only where there is some conduct (carrying a cane or using a guide dog) or indication (waving a cane) by the pedestrian that he or she is sight or hearing impaired. To find as the Plaintiff urges renders the language regarding "timely warning" and use of a white cane or guide dog superfluous. RCW 70.84.040. We do not interpret statutes so as to render any language superfluous. *Yakima Cy. (West Vly.) Fire Protec. Dist. v. Yakima*, 122 Wn.2d 371, 858 P.2d 245 (1993). We hold, therefore, that the duty and liability provisions of RCW 70.84.040 are triggered on a finding that a driver had notice of the victim's impairment. This conclusion is further supported by both commentary and settled law governing the enhanced duty of care afforded pedestrians with disabilities. In his discussion of disabled persons and the law, Jacobus tenBroek, founder of the National Federation of the Blind, stated that "[w]hen the driver knows, or in the exercise of normal faculties should have known, that the pedestrian was disabled, he must exercise a high degree of care to avoid injuring him". Jacobus tenBroek, *The Right To Live in the World: The Disabled in the Law of Torts*, 54 Cal. L. Rev. 841, 901 (1966). Likewise, 5-6 Xenophon P. Huddy, *Automobile Law*, ch. 1, "Duty of Motorist To Avoid Injury to Pedestrian", at 21-22 (1931) acknowledges that "[p]ersons under physical disability . . . are favored by the law" but adds the proviso that "[o]f course, no special care is imposed on the motorist in such cases unless he knows, or in the exercise of reasonable care should know, that the person was under some disability"; *cf.* David Leitner, "Pedestrians" § 24.02[6], *in* 2 *Automobile Accident Law & Practice* (Keith C. Miller ed., 1991). American Jurisprudence states in relevant part:

The law exacts of a motorist greater care for those who are unable to care for their own safety, such as blind persons . . . when such physical disability is known or should have been known to the motorist. That is, this increased duty imposed upon a motorist by reason of the physical disability of a person in the highway is dependent upon the motorist's knowledge of such disability or of facts which should charge him with knowledge thereof.

(Footnotes omitted.) 7A Am. Jur. 2d *Automobiles and Highway Traffic* § 449 (1980).

Courts throughout the country have followed this rule. *See, e.g., Becka v. Horvath,* 90 Ohio L. Abs. 574, 184 N.E.2d 455 (Ct. App. 1962) (a driver must exercise greater care to a pedestrian known to be blind); *Reilly v. Dunnavant,* 200 F.2d 213 (4th Cir. 1952) (the duty to exercise special care arises only with knowledge of incapacity); *Weinstein v. Wheeler,* 127 Or. 406, 414, 271 P. 733 (1928) (drivers who observe, or in the exercise of reasonable diligence ought to know, that a pedestrian is blind must use commensurate care); *Brown v. Mayor & Coun.,* 27 Del. (4 Boyce) 492, 90 A. 44 (1914) (the driver of a vehicle is bound to consider the incapacities of pedestrians when such incapacity is known or should have been known by him or her). Courts have refused to impose the enhanced standard of care absent such knowledge. *Belknap v. Klaumann,* 181 Or. 1, 178 P.2d 154 (1947) (reversing judgment because the trial court failed to instruct the jury on the issue of the defendant's notice of the plaintiff's disability); *Cardis v. Roessel,* 238 Mo. App. 1234, 186 S.W.2d 753 (1945) (proof of knowledge of infirmity is essential to a plaintiffs recovery); *Provinsal v. Peterson,* 141 Minn. 122, 169 N.W. 481 (1918) (affirming a directed verdict in favor of the defendant where no evidence indicated that the defendant knew about the plaintiffs incapacity).

The element of notice has now been incorporated in the law of a majority of states through enactment of white cane statutes. As tenBroek noted:

[S]uch laws have affected the legal status of the blind and partially blind, [and] they have as a matter of fact greatly contributed to their safety. Knowledge that the white cane and dog are symbols of the blind is as yet far from universal but is

becoming fairly well diffused. To the extent that this knowledge does exist, the cane and the dog provide effective notice and inspire efforts on the part of drivers to avoid their users and on the part of pedestrians and others to assist them.

TenBroek, at 903.

Although there are few reported decisions interpreting white cane laws, those courts construing such laws have found that notice is a prerequisite to liability. In *Scott v. Webb*, 583 S.W.2d 846 (Tex. Civ. App. 1979) the court interpreted a law similar to our own. There, a blind pedestrian with a guide dog was struck in an intersection by one vehicle and narrowly missed by another going in the same direction. The blind pedestrian started across the intersection from the drivers' right side. The first vehicle stopped and obstructed the second driver's view. The second driver collided with the pedestrian. The pedestrian sued, arguing that both drivers violated the Texas white cane law by failing to take "all precautions necessary". *Webb*, at 849. The jury determined that the second driver was not negligent because his view was obstructed by the first vehicle. *Webb*, at 849. On appeal, the plaintiff asserted that both defendants were guilty of negligence per se for violation of the white cane law. The court rejected this argument and noted that substantial evidence suggested that the second driver "could not have seen plaintiff until immediately before he struck plaintiff". *Webb*, at 849; *see also Caskey v. Bradley*, 773 S.W.2d 735, 738 (Tex. Ct. App. 1989) (applying negligence concepts under the white cane law).

In short, neither the language of the Washington statute nor its legislative history suggests that the Legislature intended to hold motorists liable even where the motorist was reasonably unaware of the pedestrian's impairment. Further, Plaintiff has not presented this court with any examples of statutes in other jurisdictions that hold motorists who collide with blind pedestrians strictly liable regardless of notice. Conversely, our interpretation of the statute finds support in the language of the statute, established jurisprudence, and longstanding case law in other jurisdictions.

The question remains whether the jury was properly instructed as to the standard used in determining whether Engum had notice of McKee's blindness. The trial court instructed the jury that in order to find Engum liable it must find that Engum saw McKee or, "in the exercise of ordinary care", should have seen her. Clerk's Papers, at 136. The statute itself does not indicate what degree of care drivers must exercise in keeping a lookout for blind pedestrians, but states only that drivers must take "all necessary precautions to avoid injury to such pedestrian". RCW 70.84.040. This language, however, refers to the degree of care required of a driver when he or she approaches a pedestrian already known to be blind.

In his discussion of white cane laws, tenBroek notes "[t]he motorist remains bound to that acuity of observation which graces the ubiquitous reasonable man, and so presumably will be charged with observing him whom he should have rather than him whom he did in fact". TenBroek, at 908.

Use of a negligence standard in this case is supported by RCW 46.61.245, which states that "every driver . . . shall exercise due care" to avoid colliding with any pedestrian. Black's Law Dictionary defines "due care" as "[t]hat care which an ordinarily prudent person would have exercised under the same or similar circumstances" and states that "due care" and "ordinary care" are often used as convertible terms. Black's Law Dictionary 499 (6th ed. 1990). The view that drivers need only exercise ordinary care in discovering a pedestrian's infirmity is also supported by longstanding law regarding pedestrians with disabilities. "A blind person may lawfully use the streets and highways, and drivers who observe, or in the exercise of reasonable care ought to observe, that a pedestrian is blind must use care commensurate with the danger involved." 5-6 Huddy, at 22. "If the fact that the pedestrian is blind is not known to the operator and not discoverable by him in the exercise of ordinary care he may drive his machine as an ordinarily prudent man would and as if the pedestrian were in possession of his

sense of sight." C.P. Berry, *Automobiles* ch. 12, "Rights and Liabilities of Incapacitated or Inexperienced Persons" § 2.373 (7th ed. 1935). "[Driver] is not under a duty to anticipate that they [pedestrians] are subject to physical disabilities where there is nothing which should reasonably suggest such disabilities." (Footnotes omitted.) 60A C.J.S. *Motor Vehicles* § 394 (1969).

Thus, we find that the trial court properly instructed the jury that in order to find for the Plaintiff, it must find that Engum either saw, or in the exercise of ordinary care should have seen, McKee in the crosswalk with her white cane.

■■ Plaintiff next argues that the trial court erred in denying its directed verdict and JNOV motions under both a strict liability standard and a negligence standard. Since we have previously addressed the issue of strict liability, it is only necessary to review this question under the negligence standard.

In reviewing a trial court's decision to deny a directed verdict or JNOV, this court applies the same standard as the trial court. As this court stated in *Hizey v. Carpenter*, 119 Wn.2d 251, 271-72, 830 P.2d 646 (1992) (quoting *Industrial Indem. Co. of Northwest, Inc. v. Kallevig*, 114 Wn.2d 907, 915-16, 792 P.2d 520, 7 A.L.R.5th 1014 (1990)):

> A directed verdict or judgment n.o.v. is appropriate if, when viewing the material evidence most favorable to the nonmoving party, the court can say, as a matter of law, that there is no substantial evidence or reasonable inferences to sustain a verdict for the nonmoving party. . . .
>
> The inquiry on appeal is limited to whether the evidence presented was sufficient to sustain the jury's verdict. Denial of a motion for directed verdict or judgment n.o.v. is inappropriate only when it is clear that the evidence and reasonable inferences are insufficient to support the jury's verdict.

In this case, viewed in the light most favorable to the Defendants, we find sufficient evidence to sustain a verdict for the Defendant. Engum, while stopped at the intersection with his turn signal on, saw McKee who appeared to look directly at him acknowledging his presence and his intention to turn. He did not notice a white cane. Engum checked

traffic and looked again at McKee, who remained on the corner. Engum testified that he believed McKee saw the truck and was waiting for the truck to turn, so he proceeded into the intersection. While in the process of turning, he checked his mirrors but never saw McKee walk into the crosswalk.

Experts on both sides testified that there were only seconds or fractions of seconds that Engum could have seen McKee enter the crosswalk. A mechanical engineering expert for the Defendants opined that if McKee had been walking at 4 feet per second she would have only been visible in the crosswalk for two segments of time lasting .67 seconds each. On the other hand, if she were walking at 4.27 feet per second she would have been visible for only one .63-second period. Contrary to police reports, Plaintiff's accident expert opined that McKee was hit further out in the intersection and then carried to the position where she was discovered. He believed that McKee was within Engum's view for 6.4 seconds before impact and that for 3 of those seconds McKee would have been in the crosswalk, although he noted that during part of this time McKee would only have been visible through the truck's rear window.

Based on this evidence, the jury could have determined that Engum reasonably assumed that McKee was sighted and aware of his truck's presence when she looked directly at him. Furthermore, the jury could have reasoned that Engum was not negligent in failing to observe McKee enter the crosswalk because she appeared to be waiting for him to turn, because she was only visible for short instances, and because he was also required to check for traffic and pedestrians in other directions. Plaintiff stresses the fact that Engum noticed McKee's dark sunglasses and wondered why anyone would wear such glasses on such a dreary day. However, Engum testified that he never made the connection that McKee was wearing the glasses because she was blind. Engum testified that McKee looked directly at him and that the white cane was not visible. He thought she could see and hear the truck making its turn. Viewed in a light most

favorable to the Defendants, substantial evidence supports a finding that Engum was reasonably unaware of McKee's blindness and her presence in the crosswalk.

Moreover, the case which Plaintiff cites, *Van Cleve v. Betts*, 16 Wn. App. 748, 559 P.2d 1006 (1977), does not support its position. In *Van Cleve*, a motorist turned left in an intersection and collided with a pedestrian. The motorist testified that she never saw the pedestrian until she heard a thud and saw the body in her rearview mirror. The Court of Appeals upheld the trial court's directed verdict in the Plaintiff's favor stating that failure to yield the right of way to a pedestrian lawfully in the crosswalk is negligence as a matter of law where the driver saw or should have seen the pedestrian. *Van Cleve*, at 752. The factual scenario in *Van Cleve* is distinguishable from the instant case. In *Van Cleve*, the driver's view was unobstructed, the pedestrian's presence and intention to cross was obvious, and the driver claimed that she never even saw the pedestrian. Here, Engum was operating a larger vehicle with more limited visibility. Nevertheless, while he was stopped, he clearly viewed McKee and formed the opinion that she was waiting for him to turn. Because of the limited visibility, after Engum started to turn, there were fewer instances where Engum could have seen McKee after she left the curb and entered the crosswalk. The evidence appears sufficient to support a jury finding that Engum was reasonably unaware of McKee's presence in the crosswalk.

Defendants contend that *Van Cleve* is also distinguishable because, unlike the pedestrian in that case, McKee was not lawfully in the crosswalk. Whether McKee was lawfully in the crosswalk, however, is not an issue. RCW 70.84.040 charges drivers approaching blind pedestrians with an enhanced duty of care and does not condition that duty on whether or not the pedestrian is lawfully in a crosswalk. The issue is merely whether Engum was reasonably unaware that McKee was carrying a white cane.

We note that Defendants raised several other challenges to the jury instructions in case we found that RCW 70.84.040 imposes strict liability, regardless of knowledge of the

victim's blindness. However, since we find in favor of the Defendants on the issue of notice, we find it unnecessary to reach the remaining challenges.

The judgment is affirmed.

ANDERSEN, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.