[No. 39775-3-I. Division One. July 20, 1998.]

THE STATE OF WASHINGTON, *Respondent*, v. BRIAN P. MERRITT, *Appellant*.

---

970

*Eric Broman* of *Nielsen, Broman & Associates, P.L.L.C.,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Michael J. Lang* and *James M. Whisman, Deputies*; and *Pamela B. Loginsky, Deputy Prosecuting Attorney for Kitsap County,* for respondent.

GROSSE, J. — In an implied consent case, we reject Brian Merritt's claim that "qualified technicians" who draw blood pursuant to RCW 46.61.506(4) are subject to the permit requirements of RCW 46.61.506(3) for those analyzing blood samples, and, in addition, find sufficient evidence to support his conviction.

## FACTS

Merritt drove a car that was involved in a one-car ac-

cident in which his sole passenger, Nicole Bianco, died at the scene. Merritt lost control of his car, hit a large rock, and flipped into a tree. Nicole died shortly after the accident of internal injuries consistent with being a passenger in a rollover accident. Merritt and Nicole and five other friends were going from one party to another that night. The friends were traveling in vehicles behind Merritt's car. It is not disputed that Merritt was drinking at the first party. There is also no dispute that Merritt was speeding at the time of the accident. Additional evidence of his driving will be set forth as needed in the discussion below.

Following the accident, Merritt was transported to St. Francis Hospital in Federal Way. At the hospital Merritt was given his *Miranda*[1] rights and arrested for the crime of vehicular homicide. Pursuant to the implied consent statute, a person under arrest for that crime must submit to a blood test. RCW 46.20.308(3). This was explained to Merritt and he signed a special evidence warning and release pursuant to that statute. Under a related statute, a limitation exists as to who may *draw* the blood of the person alleged to have been driving under the influence. This blood draw may be performed by physicians, registered nurses, or qualified technicians. RCW 46.61.506(4). The statute also provides a limitation on who may *analyze* the blood sample. The analysis of the blood must be performed according to methods approved by the state toxicologist by an individual possessing a valid permit issued by the state toxicologist for this purpose. RCW 46.61.506(3).

Josephine Tay is a medical technician employed by St. Francis Hospital. She had been employed there for a period of at least nine years as a medical technician. She withdrew blood from Merritt for analysis. A chemist with the state toxicology laboratory analyzed Merritt's blood. In the two tests conducted by the chemist, the blood alcohol level was 0.153 and 0.154.

Counsel for Merritt presented a motion to suppress the blood test results, claiming that pursuant to the statute the

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

medical technician who withdrew Merritt's blood was not qualified to do so. The parties entered a stipulation as to the qualifications and related history of Ms. Tay.

## DISCUSSION

Merritt claims the trial court committed reversible error in admitting the blood test results because the technician who withdrew his blood was not a "qualified technician" under the statute. Additionally, he claims there is insufficient evidence to convict him of the crime in any event.

 The first issue is one of statutory interpretation or construction. The issue is a question of law and is reviewed de novo.[2] In determining the meaning and scope of a statute, this court applies general principles of statutory construction. The fundamental duty of the court is to ascertain and carry out the intent of the Legislature.[3] If a statute is unambiguous, however, it is not subject to judicial construction and its meaning is to be derived from the language of the statute alone.[4] Statutes are to be construed as a whole, considering all provisions in relation to each other and giving effect to each provision. Statutes are construed so as to avoid strained or absurd consequences.[5]

Merritt argues that the permit required by RCW 46.61.506(3)[6] for those analyzing blood samples also applies to "qualified technicians" who *draw* blood pursuant to

---

[2]*Clauson v. Department of Labor & Indus.*, 130 Wn.2d 580, 583, 925 P.2d 624 (1996); *Wheeler v. Department of Licensing*, 86 Wn. App. 83, 85, 936 P.2d 17 (1997).

[3]*State v. Alvarez*, 128 Wn.2d 1, 11, 904 P.2d 754 (1995).

[4]*State v. Chester*, 133 Wn.2d 15, 21, 940 P.2d 1374 (1997).

[5]*Wright v. Engum*, 124 Wn.2d 343, 351-52, 878 P.2d 1198 (1994).

[6]The section provides in full:

> Analysis of the person's blood or breath to be considered valid under the provisions of this section or RCW 46.61.502 or 46.61.504 shall have been performed according to methods approved by the state toxicologist and by an individual possessing a valid permit issued by the state toxicologist for this purpose. The state toxicologist is directed to approve satisfactory techniques or methods, to supervise the examination of individuals to ascertain their qualifications and competence to conduct such analyses, and to issue permits

RCW 46.61.506(4).[7] He contends that drawing the blood is part of the process of analyzing the blood, and that a person withdrawing the blood must have a permit from the state toxicologist's office to do so.

■■ What is at issue here is the meaning or scope of the term "qualified technician." The statute does not define the term. In the absence of a specific statutory definition, words in a statute are given their common-law or ordinary meaning.[8] A court may resort to a dictionary to determine the meaning of a statutory term if the common and ordinary meaning of the term is not readily apparent.[9] By either the ordinary meaning approach, or by resorting to the dictionary definition, Merritt's argument fails.[10] The blood analysis section of the statute, RCW 46.61.506(3), is clear that the person analyzing the blood sample to determine its alcohol content must possess a valid permit to do so, and that person must perform the test according to methods approved by the state toxicologist. The subsequent section of the statute, RCW 46.61.506(4), does not contain the same permit requirement, but does limit those drawing blood to physicians, registered nurses, and quali-

which shall be subject to termination or revocation at the discretion of the state toxicologist.

[7]The section provides in full:

When a blood test is administered under the provisions of RCW 46.20.308, the withdrawal of blood for the purpose of determining its alcoholic or drug content may be performed only by a physician, a registered nurse, or a qualified technician. This limitation shall not apply to the taking of breath specimens.

[8]*Alvarez*, 128 Wn.2d at 11; *State v. Smith*, 117 Wn.2d 263, 270-71, 814 P.2d 652 (1991).

[9]*Zachman v. Whirlpool Fin. Corp.*, 123 Wn.2d 667, 671, 869 P.2d 1078 (1994).

[10]Even if we found it necessary to resort to a dictionary definition, "qualified" means:

1 a : fitted (as by endowments or accomplishments) for a given purpose: competent, fit[;] b : having complied with the specific requirements or precedent conditions (as for an office or employment): ELIGIBLE, CERTIFIED[.]

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1858 (1981). It is obvious that such a person can qualify by education, training, or experience, something Ms. Tay possessed.

fied technicians. Obviously the statute does not allow a policeman or passerby to administer a blood test. However, the plain meaning of the section is that someone who has appropriate and adequate medical training or experience must draw the blood. The withdrawing of the blood here was done by a medical technician who was competent and qualified to draw blood.[11] Merritt's request that this court extend the licensing or permit requirement of those analyzing blood to those drawing blood pursuant to subsection (3) is rejected.

Merritt's reliance on *State v. Ibsen*,[12] a case from the state of Hawaii, is easily distinguished. The *Ibsen* court held that an administrative rule requiring certification by the state toxicologist to take blood samples must be read together with a statute which provided that no person other than a physician, *licensed laboratory technician*, or registered nurse may withdraw blood for the purpose of determining the alcoholic content therein as a matter of law. The Hawaii court concluded that the statute in conjunction with the administrative rule established a licensing requirement for those laboratory technicians who draw blood. But there, unlike here, the Hawaii statute expressly referred to the licensing requirements for the technician. RCW 46.61.506 requires a permit or license only for individuals *analyzing* blood under subsection (4). Our Legislature separated the procedure of analyzing the blood from the procedure for drawing the blood. Each procedure was addressed in a separate subsection. There is no state toxicology permit requirement in the section that describes those persons who can draw the blood.

■ Whether a technician is a "qualified technician" as required by statute is a matter for the discretion of the

---

[11]The technician is under the supervision of the medical staff at the hospital. Drawing blood is part of her job, and has been for many years. The prosecution and the defense stipulated to the fact that Ms. Tay is a trained medical technician, quite experienced at drawing blood. But the State and the defendant disagreed as to whether Ms. Tay meets the definition of "qualified technician" found in the statute. We hold that she does.

[12]*State v. Ibsen*, 6 Haw. App. 550, 735 P.2d 957 (1987).

trial court. A person may qualify as an "expert" by knowledge, skill, experience, training, or education. The parties presented their stipulation and argument to the trial court and the court found that Ms. Tay was a qualified technician as contemplated by the statute. A review of the stipulation and the evidence indicates there was no abuse of discretion.

■ Merritt also claims there was insufficient evidence to support the fact that his driving was the proximate cause of Nicole's death, and that he was under the influence of alcohol at the time of the accident. When reviewing the sufficiency of the evidence in a criminal case such as the one here, the issue is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[13]

RCW 46.61.520, the vehicular homicide statute, states as follows:

> (1) When the death of any person ensues within three years as a proximate result of injury proximately caused by the driving of any vehicle by any person, the driver is guilty of vehicular homicide if the driver was operating a motor vehicle:
>
> (a) While under the influence of intoxicating liquor or any drug, as defined by RCW 46.61.502; or
>
> (b) In a reckless manner; or
>
> (c) With disregard for the safety of others.
>
> (2) Vehicular homicide is a class A felony punishable under chapter 9A.20 RCW.

Thus, vehicular homicide can be committed in one of three alternative ways. Merritt was charged under the first alternative. The instruction given to the jury (instruction 3) required proof that Merritt operated a motor vehicle while under the influence of intoxicating liquor, proximately causing the death of Nicole Bianco.

---

[13]*State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

A review of the record indicates there is ample evidence of Merritt's alcohol consumption. There was physical evidence at the scene. The toxicology lab analyzed his blood to levels of .153 and .154. Taking the expert testimony of the state toxicologist, the court can conclude that Merritt had a blood alcohol level of 0.15 or slightly higher as opined by Dr. Logan, the state toxicologist, and therefore under the influence of intoxicating liquor.

■■■ A conviction for vehicular homicide under this alternative also requires proof that Merritt's driving was a proximate cause of the victim's death.[14]

Merritt claims the road and the weather conditions were an independent, intervening cause for his losing control of the car, and hence Nicole's death. But here, unlike the cases cited by Merritt, there was evidence of a failure to exercise prudent or ordinary care in driving from which the jury could conclude that the driving was the proximate cause of the accident.

There was testimony from the other partygoers about the weather being cold and damp. Some thought there was a slight drizzle; others said there was light snow; but all agreed that even if it was snowing it was not sticking and turned to moisture when it hit the road. The same conditions were reported by the investigating officers and detectives. All of the other cars were able to stop, and the accident reconstruction tests that night showed there was no problem with the road or road conditions. The condition of the road was not an intervening cause.

There were many witnesses who testified to Merritt's excessive speed the night of the accident.[15] Most of the witnesses traveling in the vehicles following Merritt's car testi-

---

[14]*See State v. Rivas*, 126 Wn.2d 443, 896 P.2d 57 (1995).

[15]Excessive speed, permissive inference of reckless driving, *see* 11A WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 95.03, at 191 (2d ed. 1994); *but see Schwendeman v. Wallenstein*, 971 F.2d 313 (9th Cir. 1992), *cert. denied*, 506 U.S. 1052, 113 S. Ct. 975, 122 L. Ed. 2d 130 (1993) (error to give permissive inference instruction that reckless driving could be inferred solely from speeding; isolated speed not enough to support conviction).

fied that he was proceeding at least 20 mph above the posted speed limit of 25 mph, on a steep slope going into Marine Hills.[16] Although these witnesses thought he was "doing okay," at least one indicated Merritt crossed over the center line a couple of times before turning onto Marine View Drive, and then swerved and lost control after hitting a bump or dip going down the hill into the Marine Hills development. Merritt admitted that Nicole asked him to slow down before the accident occurred.

Police officers at the scene of the accident testified to Merritt's poor physical coordination, and that he was swaying while standing in place. Investigating officers smelled the odor of alcohol from the interior of the car and found a large plastic cup containing beer within six feet of the car.

There is substantial evidence to support the conviction. The State proved the elements of the crime beyond a reasonable doubt.

We affirm.

KENNEDY, C.J., and ELLINGTON, J., concur.

---

[16]See, for example, the testimony of Danyal Pennington regarding the speed and the crossing over of the lines. RP 1, at 124.