[Nos. 29880, 29881. Department Two. August 12, 1946.]

JOSEPH B. SMITH, *as Guardian Ad Litem of William S. Smith, a Minor, Respondent,* v. HENRY M. FITCH, *as Executor, Appellant.*

JOSEPH B. SMITH, *as Guardian Ad Litem of the Person and Estate of Emilyn E. Smith, a Minor, Respondent,* v. HENRY M. FITCH, *as Executor, Appellant.*[1]

[1]Reported in 171 P. (2d) 682.

*Wright & Wright* and *Douglas D. Mote,* for appellant.
*Lundin & Barto* and *Joseph B. Smith,* for respondent.

JEFFERS, J.—Joseph B. Smith, as guardian *ad litem* of William S. Smith, a minor, instituted an action against Henry M. Fitch, as executor of the estate of Matilda F. Fitch, deceased; and at the same time Mr. Smith, as guardian of the person and estate of Emilyn E. Smith, a minor, instituted another action against such executor. We shall hereinafter refer to the action brought on behalf of William S. Smith as the William Smith cause of action, and to the other suit as the Emilyn Smith action. Both actions were commenced about June 14, 1945.

The complaints in both actions were undoubtedly based on the theory that the minors were general creditors of Matilda Fitch, and, pursuant to such theory, it is alleged in the Emilyn Smith case that, after the death of Matilda Fitch, and on May 11, 1945, the plaintiff filed a claim against her estate in the sum of $193.75, which claim was, on May 21, 1945, rejected by the defendant executor. Subsequently, this action was brought.

The complaint in the William Smith action alleged that, on May 11, 1945, the plaintiff served on the attorney for the executor and filed with the estate of Matilda Fitch a claim for $1,090, which claim was rejected by the executor on May 21, 1945. Thereafter, the William Smith action was commenced.

The answer of the executor in each case denied that the estate of Matilda Fitch was indebted to the minors in any sum whatsoever, and alleged affirmatively that no claim on behalf of either of the minors was served or filed until May 12, 1945.

The two actions were consolidated for the purpose of trial and came on for hearing before the court on October 25, 1945. Plaintiff called three witnesses, to wit: Joseph Smith, the father of the two minors, William Sidney Smith (the same person as William S. Smith), and Jean Dieter, a sister of Matilda Fitch, deceased.

When the claims above referred to were introduced in evidence by plaintiff, it appeared therefrom that, instead of having been served and filed on May 11, 1945, as alleged in

the complaints, they were neither served nor filed until May 12, 1945. It also appearing that the notice to creditors of the estate of Matilda Fitch had been published the first time on November 11, 1944, defendant executor moved for a dismissal of the actions, for the reason that the claims had not been served and filed within the time required by Rem. Rev. Stat., § 1477 [P.P.C. § 197-1], and that therefore no recovery could be had in either action based on such claims.

Section 1477, *supra,* provides in part that any person having a claim against a deceased shall serve the same on the executor or administrator, or his attorney of record, and file with the clerk of the court, together with proof of such service, *within six months after the date of the first publication of notice to creditors.*

■ We are satisfied that, under the interpretation given to Rem. Comp. Stat., § 1477 (now Rem. Rev. Stat., § 1477), in the case of *Davis v. Shepard,* 135 Wash. 124, 237 Pac. 21, 41 A. L. R. 163, the above claims were not served or filed within the six months' period and were barred, and that no recovery could have been had based on such claims. Counsel for plaintiff in effect so admitted, for after the above motion to dismiss was made, he stated to the court:

"If the Court please, I have gone over the records in connection with this matter and am of the opinion this morning that the time within which this claim [referring to both cases] might have been filed expired midnight on the 11th of May, 1945. I cannot come to any other conclusion."

At this time, all of plaintiff's evidence in both cases had been presented. Counsel for plaintiff then stated:

"But there is another factor in this case [William Smith case] which puts an entirely different complexion on it, and that is this. The records in this case show William Sidney Smith volunteered for service in the United States marines in 1943. You will recall he was in Alaska at the time of his mother's death and flew down, and he is still in the marines now. He is under the protection of the provisions of the Soldiers and Sailors' Relief act, which absolutely tolls this statute."

After argument, counsel for plaintiff continued:

"It is the law of this state in the trial of a cause the pleadings may be amended to conform to the proof and the plaintiff so move in this case. The proof in this case shows the existence, or the creation, of a trust in favor of these children."

Counsel for defendant executor contended that, under the facts in this case, the soldiers and sailors' relief act had no application to William Smith, as he had been in Seattle since October 31, 1944, which was shortly after the death of his mother, Matilda Fitch, she having passed away on October 28, 1944, he was within the jurisdiction of the court, had filed a claim, and was represented by his guardian *ad litem,* and could not now claim the protection of the act.

It may also be stated that, at the time of the trial, it appearing that William Smith had become twenty-one years of age, he was substituted as plaintiff in the action brought by his guardian *ad litem.*

After some extended argument of counsel, the court stated:

"I would hold the act [soldiers and sailors' relief act] would apply to the claim of the young man and I would hold further that the trust fund that was turned over to the deceased did not become a part of the estate. The relation of debtor and creditor didn't exist between them and there was no necessity for filing a claim in that estate. I will direct judgment for each of the plaintiffs."

Mr. Mote, attorney for defendant, then stated: "Just a minute, you are granting an amendment on a different theory," to which the court replied: "It is not what I am doing. I have done it."

Defendant stood on his motion and offered no proof.

The trial court entered separate findings of fact, conclusions of law, and judgment in each case. In the Emilyn Smith case, the court found that Emilyn was the daughter of Joseph B. Smith, plaintiff, and Matilda F. Fitch, formerly Matilda Smith; that, during the year 1940, Joseph B. Smith delivered to Matilda F. Fitch the sum of one thousand dollars to be invested in government bonds and held by her in

trust for the use of Emilyn Smith in obtaining her education; that Matilda Fitch then and there agreed that she would place such sum in United States bonds.

The court further found that Matilda Fitch died in Seattle on October 28, 1944, and that Henry M. Fitch was qualified as executor of her will; that thereafter plaintiff demanded of such executor the delivery of the bonds to plaintiff as guardian of Emilyn Smith; that thereafter defendant delivered to plaintiff one of the United States bonds; that the only bond which was a part of the trust estate and which was turned over to plaintiff by the executor was of the value of $806.25, and there is still due and payable to plaintiff for the use and benefit of the minor out of the trust fund the sum of $193.75.

The court further found that Matilda Fitch had in her lifetime used a portion of the bonds for the benefit of her estate; that plaintiff had demanded repayment of the balance of the trust fund from defendant *out of the assets of the estate*, and the assets of the estate are in ample amount to repay the amount of the trust fund to plaintiff; that defendant has refused to repay such sum, or any part thereof.

Judgment was rendered against defendant in the sum of $193.75, with interest from October 28, 1944. Defendant executor has appealed from the judgment entered in the Emilyn Smith case, and we shall first discuss the questions therein raised and the evidence applicable thereto, before discussing the William Smith case.

The following are the assignments of error made by appellant in the case now under consideration: The court erred (1) in holding that no filing of a claim was necessary; (2) in not dismissing the complaint on appellant's motion; (3) in permitting the amendment to be made; (4) in holding that there was a trust fund; and (5) in signing findings of fact Nos. 4, 5, and 6, for the reason that they are not supported by the evidence.

Referring to assignments of error Nos. 1 and 4, we are of the opinion there was sufficient evidence to show the

creation of a trust in favor of Emilyn Smith. Having so concluded, we are of the further opinion it was not necessary to file a claim against the estate of Matilda Fitch.

■■ The following testimony goes to the question of whether or not a trust was created. Joseph B. Smith testified that he was the former husband of Matilda Fitch, who passed away on October 28, 1944; that he and Matilda Fitch were divorced in 1932; that the minors here involved are the children of Joseph B. Smith and Matilda Fitch, formerly Matilda Smith.

Mr. Smith then described the transaction out of which Mrs. Fitch obtained the money which she was to hold in trust for these two children. The gist of the transaction was that certain property was sold for thirty-two or thirty-three hundred dollars, and Mrs. Fitch obtained this money, Mr. Smith then being in the east. Mr. Smith demanded that the money be sent to him, and when this was not done he came west and went to see Mrs. Fitch. Mr. Smith testified that at this meeting Mrs. Fitch, in the presence of her husband, Henry Fitch, stated:

" 'Mr. Mote [her attorney] says you can set this proceeding [the one whereby Mrs. Fitch obtained the money] aside, but if you do you will have to take the money away from the children. I have put one thousand dollars of the money in the name of Sidney [William Smith] in United States savings and I have put one thousand dollars in United States bonds for Emilyn.' "

Mr. Smith's testimony continues:

"I said: 'I tell you, as far as I am concerned I am willing to do this, leave the one thousand dollars to be Sidney's in the bank and leave the money in bonds, the one thousand dollars for Emilyn and you keep the balance.' It just had me whipped. I would not take the money out and out from the children."

He further testified that Mrs. Fitch agreed to the above arrangement.

Mr. Smith identified a receipt which he gave to appellant executor for personal property turned over to him by the executor. This receipt shows that four bonds belonging to

Emilyn Smith were delivered to him by the executor. These bonds are described as follows: one United States defense bond issued in the name of Emilyn E. Smith in February, 1940, of the face value of one thousand dollars; two United States defense bonds issued September, 1943, in the name of Emilyn E. Smith or Mrs. Matilda Fitch, each of the face value of twenty-five dollars; one United States defense bond issued in August, 1942, in the name of Emilyn E. Smith or William Sidney Smith, face value twenty-five dollars. Mr. Smith testified that two of the above bonds were not part of the one thousand dollars left in trust with Mrs. Fitch. The testimony is not at all clear as to just which of them were not purchased with the trust funds. The substance of Mr. Smith's testimony and the basis for the amount of the claim in the Emilyn Smith action is that, while Mrs. Fitch had one thousand dollars to invest, she invested only $806.25. In other words, the face value of the bonds should not be taken as determinative, but the actual value at the time of purchase, which respondent contends, and the trial court apparently found, was $806.25.

We find no testimony in the record that Mrs. Fitch ever used any of the Emilyn Smith money for her own use, nor do we find any evidence which would warrant a conclusion that any of the one thousand dollars left in trust for Emilyn was still among the assets of Mrs. Fitch's estate. Neither do we find in the record any attempt to trace the Emilyn Smith trust fund other than in the purchase of bonds. The judgment is undoubtedly against Mrs. Fitch's estate, and if sustained will take from the estate the sum claimed.

Some question is raised in regard to the establishment of this trust. We are of the opinion that in this state an express trust in personal property may be created and established by parol. See 54 Am. Jur. 55, § 44. We stated in *Tucker v. Brown*, 199 Wash. 320, 92 P. (2d) 221:

"An express trust is one created by the act of the parties; and, where a person has, or accepts, possession of money, promissory notes, or other personal property with the express or implied understanding that he is not to hold it as his own absolute property, but to hold and apply it for cer-

tain specified purposes, an express trust exists. [Citing authority.]"

■ We are of the opinion there was sufficient evidence in this case to show the creation and establishment of a trust in favor of both Emilyn and William Smith, and that the court did not abuse its discretion in allowing the pleadings to be amended to conform to the proof.

Having relied on the trust theory, it was necessary for respondent to trace the trust funds which he claimed were wrongfully diverted.

■ If the trust fund has been mingled by the trustee with his own property so that it can no longer be identified, the beneficiary must present his claim against the estate as other claims. *Davis v. Shepard,* 135 Wash. 124, 237 Pac. 21.

■ The general rule applicable to tracing trust funds is stated in *Redfield v. Johnson,* 159 Wash. 39, 291 Pac. 1077:

"And no rule is more fully recognized than the rule that a *cestui que trust* may follow trust funds wrongfully diverted through all its changes, and recover the fund from any property into which it has gone."

4 Pomeroy's Equity Jurisprudence (5th ed.) 148, § 1058c:

"No change in the form of the trust property, effected by the trustee, will impede the rights of the beneficial owner to reach it and to compel its transfer, provided it can be identified as a distinct fund, and is not so mingled up with other moneys or property that it can no longer be specifically separated. So long as the trust property *can be traced and followed into other property* into which it has been converted, it remains subject to the trust." (Italics ours.)

In the case of *Rugger v. Hammond,* 95 Wash. 85, 163 Pac. 408, we recognized that the degree of identification required of trust funds is less where the action is between a *cestui que trust* and a solvent trustee than it is between an insolvent trustee and creditors. In the cited case we quoted from *Holmes v. Gilman,* 138 N. Y. 369, 34 N. E. 205, 34 Am. St. 463, 20 L. R. A. 566:

"'The right has its basis in the right of property, and the court proceeds on the principle that the title has not been affected by the change made of the trust funds, and the

*cestui que trust* has his option to claim the property and its increased value as representing his original fund. The right to follow and appropriate ceases only when the means of ascertainment fail. It is a question of title.' "

The *Rugger* case also quoted from *Englar v. Offutt*, 70 Md. 78, 16 Atl. 497, 14 Am. St. 332:

" 'The true owner of a fund traced to the possession of another has a right to have it restored, not as a debt due and owing, but because it is his property wrongfully withheld from him.' "

Also, from 1 Bolles, Modern Law of Banking 190:

" 'Many a beneficiary has been unable to recover, not through his failure to prove the existence of a trust, but of a fund that he could rightfully claim as his own.' "

See *Tucker v. Brown,* 20 Wn. (2d) 740, 150 P. (2d) 604.

■ We are satisfied that, in so far as Emilyn Smith is concerned, there was no testimony showing that, at the time of the death of Matilda Fitch, her estate was augmented to the extent of $193.75 by trust funds belonging to Emilyn Smith.

As to Emilyn Smith, if the facts show anything which might have entitled her to recover, they show nothing more than that she was a general creditor to the extent of $193.75. As such creditor, it was necessary for her to file and serve a claim within the time allowed by law, and having failed to do this, she could not recover as a general creditor.

We conclude, therefore, that the judgment in the Emilyn Smith case must be, and it is, reversed, with direction to the trial court to dismiss that action.

■ We now come to the William Smith case. We shall first discuss the question of whether or not the soldiers and sailors' relief act is applicable and can be taken advantage of by respondent William Smith. We construed this act in *In re Bashor*, 16 Wn. (2d) 168, 132 P. (2d) 1027, and therein stated:

"Is the ability of respondent to conduct his defense materially affected by reason of his military service? Congress, in passing the act, intended to extend protection to persons in the military service, in order to prevent injury to their

civil rights during their terms of service and to enable them to devote their entire energy to the military needs of the nation.

"The act should be liberally construed in favor of the individual engaged in military service. However, the fact that an individual involved in litigation is in the military service is not a defense to an action. The act does mean that soldiers and sailors in the service who are handicapped by reason of their military service, either in making *valid defenses* to an action or in meeting their financial obligations, shall have the protection of the courts to prevent prejudice to their rights by reason of the service.

"As we read the quoted sections, we are of the opinion that the framers of the act intended to lodge in the court a sound discretion, upon a motion to stay proceedings being filed by a party litigant, to be exercised according to the facts as they may appear in each case." (Italics ours.)

In the case of *Lyle v. Haskins,* 24 Wn. (2d) 883, 168 P. (2d) 797, we stated:

"Section 520, *supra,* and § 520 (a) of the act [50 U.S.C.A. (App.)] were construed in *Mims Bros. v. N. A. James, Inc.,* 174 S. W. (2d) (Tex. Civ. App.) 276, and it was therein stated that a default judgment, taken without the affidavit or other requirements of § 520, is not thereby rendered void, but merely voidable at the instance of the *serviceman* (§ 520 (a)), upon proper showing of prejudice and injury. The act is for the exclusive benefit of the serviceman (and others expressly mentioned therein, but not here involved). He alone can take advantage of it, and then only upon showing that his interest has been deleteriously affected. See, also, *Hynds v. City of Ada,* 158 P. (2d) (Okla.) 907."

The record shows that William Smith arrived in Seattle shortly after his mother's death. Since that time, he has been living continuously in Seattle. It also appears that he had a guardian *ad litem* who could have, and did, file a claim in the Matilda Fitch estate. William was, at the time of trial, substituted as party plaintiff in his action, and he participated in the trial.

It is difficult for us to determine upon what theory the trial court granted judgment in favor of William Smith. The application of the soldiers and sailors' relief act was not invoked until after it was shown that the claim filed on behalf

of William Smith was filed too late. Then counsel for respondent invoked the aid of this act to toll the statute of limitation in the filing of the claim. The trial court stated the act was applicable to William Smith.

We are of the opinion that, under the facts in this case, the trial court erred in holding the above act was applicable, for the reason that William Smith was in no way prejudiced by being in the military service. His rights could have been at all times protected by his guardian *ad litem*.

We are therefore of the opinion that the only theory upon which any judgment could have been rendered in this case in favor of William Smith was on the theory that Matilda Fitch held one thousand dollars in trust for William Smith; that she never, during her lifetime, turned such funds over to William or his guardian, and that after her death the executor of her estate refused to account for or turn over to William Smith or his legal representative such trust funds; that the evidence shows that such trust funds were properly identified as such, either in specie or in property purchased with the trust funds.

Under the rules hereinbefore announced in our decision of the Emilyn Smith case, we are of the opinion that there is no evidence which would justify a money judgment against the estate of Matilda Fitch, as entered by the trial court, and that the only question presented is whether or not respondent did in fact trace the trust funds or a part thereof into specific property which was purchased by Matilda Fitch with the trust funds. If the trust funds or a part thereof can be traced into specific property, then respondent is entitled to a judgment awarding to him such property, but certainly not a money judgment against the executor of the estate of Matilda Fitch.

Joseph Smith testified that Mrs. Fitch told him she had put one thousand dollars in the name of Sidney in United States savings. This was the money which belonged to Mr. Smith, and which he and Mrs. Fitch agreed should be held by her in trust for William. According to the testimony of William Smith, an account was opened up for him in the Postal Savings Bank in 1939 or 1940 by his mother. Appar-

ently one thousand dollars was deposited at that time. William also stated that in 1940 he withdrew the entire one thousand dollars and gave it to his mother to buy furniture. At the time he claimed the money was withdrawn, William was a minor, and his mother, Mrs. Fitch, was his guardian. It is apparent, we think, that the money was not in fact withdrawn by William, but by his mother, as he was asked the following question:

"Q. Was your mother with you? [At the time the money was withdrawn.] A. Yes, she was. She had to be, she was my guardian."

William further testified that he went around with his mother to buy furniture, and he heard her make arrangements to buy furniture. He further testified that altogether his mother borrowed about eight hundred fifty dollars, and as near as we can determine from William's testimony, his mother put the balance of the money which had been withdrawn from the postal savings account into an account opened up at the Metropolitan Savings Bank.

William also testified to hearing the conversation relative to the creation of the trust fund.

After William had testified that he and his mother drew out one thousand dollars, principal, and twenty dollars, interest, from the postal savings account, he was asked:

"Q. How much of that was used, as you say, for furniture? Do you know? A. Approximately one hundred and fifty dollars."

Appellant makes much of the above answer, and contends that, at most, only one hundred fifty dollars was invested in furniture, but we are of the opinion that either the answer is a typographical error, or that William misspoke himself, for subsequently William stated that he asked appellant executor about the eight hundred fifty dollars he had loaned his mother to buy furniture, and Mr. Fitch said he would repay it another way. In other words, the direct examination of William quite conclusively shows that he claimed to have loaned his mother eight hundred fifty dollars with which to buy furniture.

On cross-examination, William testified that he was with his mother when she purchased furniture at Sears and at a small shop near Schoenfelds.

"Q. What furniture did you see purchased? A. Well, she purchased two large red chairs, or a shade of red. Q. And those were purchased from whom, do you know? A. No, I am not exactly sure. My Aunt can tell exactly. Q. Do you know how much she paid for them? A. That is another thing my Aunt can tell. Q. You don't know? A. I am not sure. . . . Q. What else did she purchase? A. A love seat, a small davenport. Q. What else? A. She purchased numerous other articles when I was not there, such as lamps to go in the front room and living room. She purchased a chaise lounge, rugs. She refurnished the front room and living room. Also, she purchased a bed. Q. What kind? A. I believe it is maple. She got the bed and also one of these sets to go along with it,—the same day,—I don't know exactly, a dresser and—a bedroom suite. . . . Q. It is your contention your mother bought this stuff around 1940? A. She bought that all at one time after I loaned her the money."

William finally testified that he was not with his mother every time she bought furniture, but she told him "the *sum total* she spent. THE COURT: And what was that sum? A. Eight hundred and fifty dollars for furniture." . . .

Jean Dieter, a sister of Mrs. Fitch and the aunt referred to by William, testified relative to Mrs. Fitch's purchase of furniture and the trust fund, as follows:

"Q. Did your sister ever talk to you about having certain monies belonging to the children? A. Yes, she talked to me about this Sequim property settlement whereby the children were to have one thousand dollars apiece for their education. Q. What, if anything, did she say about having the one thousand dollars? A. Yes, she said she did have the thousand dollars. Q. For each of them? A. Yes. Q. Did she tell you anything about how the money was to be handled? A. Well, she put the one thousand dollars away for Sidney in cash in the postal savings because he would need it sooner than Emylin, and put Emylin's in bonds so it would mature about the time she needed it for her education at the University. Q. Do you know whether or not she later used the money from the postal savings? A. She told me she used Sidney's money in order to fix up the home and have it so

they could all have the enjoyment while they were all there to enjoy it and she figured she could repay it by the time he needed it for his education. Q. Do you know how much was used at that time? A. Not exactly, no. Q. What was done in fixing up the place? A. Oh, they redecorated it and purchased new furniture. . . . Q. What did Mrs. Fitch ever tell you about purchasing furniture with this money of Sid's? A. Oh, she 'phoned me up one day and told me to come over, that she had a surprise for me and when I went over there was all new furniture and the place was all fixed up and she told me she had used Sid's money for that purpose, while they were still all able to live there and enjoy it. . . . Q. Do you know approximately the amount used in buying furniture and fixing up the house which was withdrawn from Sid's money? A. I don't know the exact amount. I know quite a few different amounts because I bought furniture at the same place, and she told me the amounts on several. Q. Can you give us any of them? A. I know, for instance, the leather chair, recovered with leather, was forty-two dollars; the love seat was forty-two dollars, and those chairs ran around thirty-five dollars apiece and the rugs were purchased at Sears. They cost several hundred dollars. I don't know the exact amount because I also purchased a little rug and I know what I paid, only she bought two instead of one. Q. What about the bedroom suite? A. It was purchased, I believe, at Sears. That was not purchased at the same place as the love seat and the chairs. Q. Where were the chairs and love seat purchased? A. A little shop straight across from Schoenfelds. I don't remember the name—Nusia—Kaufman (?)—or similar. I was not with her then but she told me the price she paid. . . . Q. Were you with her on the day she withdrew the money from Sidney's account? A. No, I was not."

On cross-examination, Mrs. Dieter testified:

"Q. How many rugs did she purchase? A. Two large wool rugs, one for the living room and one for the dining room and several scatter rugs which were made from the same material, and some congoleum rugs. Q. Where were they purchased? A. At Sears. . . . Q. Did you say she had two chairs recovered? A. One chair recovered and two chairs brand new and a chaise lounge brand new and they were all bought and the chair recovered at the same little shop. Q. Do you know anything about a maple bedroom suite? A. That was purchased from Sears. . . .

634

Q. Were you present at any time when any of the articles were purchased? A. No, I was up there and I saw it. Q. All you know with reference to the source is what Matilda is supposed to have told you? A. Yes, she told me about the source of this money and I cannot see where there is any question— . . . Q. You were not present when she bought it or when she paid for it? A. I was not present when she paid any of the bills. I only know what she told me. It is not a question of the money—it—she was not going behind on the furniture but on the money."

 We are satisfied that Mrs. Fitch could not and did not lawfully borrow the trust funds from her minor son in the manner herein stated. See 2 Scott on Trusts 888, § 170.17, wherein it is stated that a trustee cannot properly lend trust funds to himself. The same text, at p. 1157, § 216.3, states:

"The consent of a beneficiary will not preclude him from holding the trustee liable if he is not *sui juris* at the time of giving such consent or at the time when the trustee commits the breach of trust."

We are satisfied that Mrs. Fitch committed a breach of trust when she took some part of the trust fund and bought furniture therewith.

 While the description of the furniture purchased with trust funds is not too definite, nor is the price paid therefor, we are of the opinion that, in view of the facts, it appears with reasonable certainty that Mrs. Fitch used some part of the trust fund she held for William Smith to purchase the following articles of furniture, which were placed in the home and which are now in the possession of Henry Fitch, as executor of Mrs. Fitch's estate: two large wool rugs, one used in the living room and one in the dining room; two large red overstuffed chairs; one love seat or small davenport; one chaise lounge; one maple bedroom set. We are of the opinion that the above-described property is all that was sufficiently identified as having been purchased with trust funds.

We are further of the opinion that the balance of the trust fund was not sufficiently traced to permit of a judgment being entered for other than the furniture above described.

For the reasons herein stated, the judgment in the William Smith case will be modified as hereinafter stated. The cause will be remanded to the superior court with instructions to vacate the judgment entered, and to enter a judgment to the effect that William Smith is the owner, and entitled to possession, of the articles hereinbefore last above set out.

While these two cases were consolidated for the purpose of trial, and while only one statement of facts was filed, separate appeals were taken, and appellant prepared and served separate briefs. Appellant will be allowed the usual costs on each appeal, except that he will be allowed but one attorney's fee, which may be entered in the Emilyn Smith case.

BEALS, C. J., BLAKE, ROBINSON, and CONNELLY, JJ., concur.

