[Nos. 56305-0-I; 56306-8-I.   Division One.   July 3, 2006.]

WESTVIEW INVESTMENTS, LTD., ET AL., *Appellants*, v. U.S. BANK NATIONAL ASSOCIATION ET AL., *Respondents*.

---

838

*Anthony L. Rafel* and *Duncan E. Manville* (of *Rafel Manville, P.L.L.C.*), for appellants Westview Investments, Ltd., Mercer View, L.L.C., and LV Associates, L.L.C.

*Lawrence R. Cock* and *John G. Bauer* (of *Cable, Langenbach, Kinerk & Bauer, L.L.P.*), for appellant Tukwila Self Storage, L.L.C.

*Greg Montgomery* (of *Miller Nash, L.L.P.*), for respondents.

¶1 GROSSE, J. — A bank that has knowledge sufficient to require inquiry whether funds deposited by a general contractor into its bank account are trust funds cannot, as against the subcontractors, set off the funds to pay an indebtedness owed the bank by the general contractor. Here, the construction contracts at issue created express trusts designating progress payments made for the benefit of subcontractors to be trust funds. Because there is a genuine issue of material fact as to whether U.S. Bank National Association had knowledge sufficient to require inquiry whether the funds it used to offset its loan to general contractor Construction Associates, Inc., were trust funds, we reverse and remand for a trial.

# FACTS

*Common Facts*

¶2 Construction Associates began banking with U.S. Bank in 1996. In December of that year, U.S. Bank issued Construction Associates a $1,000,000 line of credit. In May 2001, U.S. Bank increased the line of credit to $1,750,000 and issued Construction Associates a $400,000 term loan.

¶3 In 2001, Construction Associates began to experience financial problems and defaulted on its loan covenants. U.S. Bank began to closely monitor the business and demanded and obtained a substantial amount of information regarding its finances. U.S. Bank also implemented a variety of control measures over Construction Associates finances.

¶4 As concern mounted, U.S. Bank transferred the loan to U.S. Bank's Special Assets Group (SAG). Before the transfer, Construction Associates' line of credit was tied to a sweep account. A sweep account consolidates all of a borrower's transactions at the end of each business day. If the borrower's deposits exceed the amount of the checks presented for payment, the excess deposits automatically reduce the amount borrowed on the line of credit from the bank. If the checks presented for payment exceed the deposits, then the amount borrowed under the line of credit is automatically increased.

¶5 In September 2001, when SAG took responsibility for Construction Associates' loans, U.S. Bank required Construction Associates to switch to a cash collateral account. Pursuant to a forbearance agreement executed on October 5, 2001, U.S. Bank required Construction Associates to deposit all checks it received in the cash collateral account. At the end of each business day, these checks were automatically transferred to U.S. Bank to reduce the amount of money loaned by the bank to Construction Associates. If Construction Associates wanted to borrow more money on its line of credit, it had to prepare and present a borrowing certificate. The borrowing certificate was reviewed by a U.S. Bank official and, if approved, the bank allowed Construc-

tion Associates to borrow money from its line of credit and money was deposited in Construction Associates' operating account. The forbearance agreement gave Construction Associates until December 31, 2001 to cure its defaults.

¶6 During the fall of 2001, Construction Associates also took steps to reduce its obligations to other creditors. Specifically, Construction Associates converted amounts in its accounts payable to long term debt by giving subcontractors notes promising to pay them less money over a longer period of time for work previously completed. By January 2002, Construction Associates had transferred $1,200,000 in accounts payable to long term debt.

*Westview*

¶7 Mercer View, L.L.C., manages the Mercer View Apartments, located at 1200 Mercer Street in Seattle. Westview Investments, Ltd., is Mercer View's sole member. LV Associates, L.L.C., owns the real property located at 1200 Mercer Street. Westview, LV Associates, and Mercer View developed the Mercer View Apartments.[1]

¶8 In October 2000, Construction Associates and Westview signed a standard form of agreement between owner and contractor developed by the American Institute of Architects (AIA) (AIA Document A101-1997). This contract incorporated by reference AIA general conditions of the contract for construction (AIA Document A201-1997) (General Conditions). Sections 9.6.2 and 9.6.7 of the General Conditions govern payments from the project owner to the general contractor for the benefit of subcontractors. Section 9.6.2 states:

> The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with

---

[1] For purposes of clarity and consistency, the Westview property appellants will be referred to collectively as "Westview" in this opinion.

each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in a similar manner.

Section 9.6.7 states:

> Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be held by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor, shall create any fiduciary liability or tort liability on the part of the Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor for breach of the requirements of this provision.

¶9 About every month during the project, Construction Associates submitted to Westview an application for payment and a conditional waiver of right to file mechanics' lien. The application contained a certification that all subcontractors had been paid for work covered by prior applications and sought payment for recently-completed work.

¶10 In early November 2001, Construction Associates submitted an application and lien waiver seeking payment of $771,762.93, which, according to Westview, included $716,423.00 for labor and materials provided to the project by subcontractors and suppliers. On November 9, 2001, Westview caused the requested payment to be wired into Construction Associates' U.S. Bank cash collateral account. Also on November 9, Construction Associates submitted a borrower's certificate requesting a new advance of $750,000.00.

¶11 Pursuant to U.S. Bank's forbearance agreement with Construction Associates, on November 13, 2001, U.S. Bank applied Westview's November 2001 progress payment against the outstanding balance owing by Construction Associates on its operating line of credit. Then on November

14, 2001, U.S. Bank advanced to Construction Associates the $750,000 request. U.S. Bank also advanced Construction Associates an additional $44,000 based on a separate request dated November 14, 2001.

¶12 On December 20, 2001, Westview issued a progress payment in the amount of $749,962.13 to Construction Associates. According to Westview, $696,996.00 of this payment was paid on account of labor and materials provided to the project by subcontractors and suppliers. Westview wired the December progress payment to Construction Associates' U.S. Bank cash collateral account.

¶13 On December 21, 2001, U.S. Bank applied the $749,962.13 payment to the outstanding balance owing by Construction Associates on its operating line of credit. On the same day, U.S. Bank advanced $673,000.00 to Construction Associates. On December 24, 2001, U.S. Bank advanced an additional $1,461,458.00 after applying $1,385,099.57 from the cash collateral account to the outstanding loan balance.

¶14 Construction Associates did not timely cure its financial defaults by December 31 as required, and U.S. Bank stopped advancing money to it after January 18, 2002. However, U.S. Bank continued to take funds from Construction Associates' cash collateral account. By January 22, 2002, the amount owing on Construction Associates' line of credit was $1,078,742.13. Construction Associates closed for business on January 25, 2002.

¶15 Subcontractors on the Mercer View Apartments project were not paid in full. The subcontractors recorded lien claims on the project totaling over $550,000. Westview paid the outstanding balances in order to satisfy the liens and complete the project.

¶16 Westview filed this lawsuit claiming that the progress payments were funds held in trust for the benefit of the subcontractors and U.S. Bank unlawfully seized those payments because it knew or should have known that those payments were trust funds. Westview also alleged

U.S. Bank's actions constituted the torts of concerted action and conversion and violated the Washington Consumer Protection Act (CPA), chapter 19.86 RCW. On April 19, 2005, the trial court granted U.S. Bank's motion for summary judgment on Westview's claims and subsequently denied Westview's motion for reconsideration. Westview appeals.

*Tukwila*

¶17 In 2001, Tukwila Self Storage, L.L.C., hired Construction Associates to build a self-storage facility. Tukwila and Construction Associates used the same standard form contract as Westview and Construction Associates. On either January 11 or January 14, 2002, Construction Associates deposited a $366,887.02 progress payment into its cash collateral account at U.S. Bank. According to Westview, $331,460.64 of that progress payment was owed to subcontractors who had done work on the Tukwila project. On the same day that Construction Associates deposited Tukwila's progress payment, it deposited other checks totaling $651,468.84. On January 14, 2002, U.S. Bank applied the $366,887.02, as well as the other deposits, against the outstanding balance owing by Construction Associates on its operating line of credit.

¶18 Also on January 14, 2002, the same day that U.S. Bank applied Tukwila's progress payment to Construction Associates' debt, Construction Associates requested to borrow $479,677. U.S. Bank instead agreed to loan only $277,663. On January 18, 2002, Construction Associates deposited another $235,136 into the cash collateral account which was used by U.S. Bank to reduce Construction Associates' debt with the bank. At the same time Construction Associates asked and was allowed to borrow $307,076. On January 25, 2002, Construction Associates requested to borrow an additional $238,650; its request was denied. U.S. Bank would not allow Construction Associates to borrow any more money on its line of credit; however, U.S. Bank continued to withdraw funds from Construction Associates'

cash collateral account and apply those funds against Construction Associates' loan. Construction Associates went out of business on January 25, 2002.

¶19 To avoid having the project shut down, Tukwila directly paid the subcontractors and material suppliers, resulting in a double payment of $309,430. Tukwila filed this lawsuit against U.S. Bank asserting that Construction Associates held the progress payments in trust and U.S. Bank misappropriated the trust money belonging to the subcontractors. U.S. Bank moved for summary judgment and Tukwila filed a cross motion for summary judgment. The trial court granted U.S. Bank's motion and Tukwila appeals that decision as well as the decision denying its cross motion for summary judgment.

## ANALYSIS

*Did the contracts create trusts?*

¶20 Several states have adopted legislation expressly imposing trust characteristics upon progress payments made to general contractors for the benefit of subcontractors pursuant to construction contracts;[2] however, Washington is not one of those states. Therefore, we must look to the language of the contracts signed by the parties to determine whether trusts were created. Although no Washington appellate opinions exist interpreting the provisions of the AIA standard form contracts at issue here, the evidence shows the contract provisions created express trusts in which Westview and Tukwila were the settlors, Construction Associates was the trustee, the subcontractors were the beneficiaries, and the progress payments were the trust res.

¶21 " 'An express trust is one created by the act of the parties; and, where a person has, or accepts, possession of

---

[2] *See* WIS. STAT. § 799.02; MD. CODE ANN., REAL PROP. §§ 9-201 to -204; DEL. CODE ANN. TITLE 6, §§ 3502-3505; MICH. COMP. LAWS SERV. §§ 570.151 - .153; OKLA. STAT. ANN. TITLE 42, §§ 152-153; NY LIEN LAW § 70; MINN. STAT. ANN. § 514.02; TENN. CODE ANN. § 66-34-304; COLO. REV. STAT. § 38-22-127; ARIZ. REV. STAT. § 33-1005; 770 ILL. COMP. STAT. ANN. 60/21.02.

money, promissory notes, or other personal property with the express or implied understanding that he is not to hold it as his own absolute property, but to hold and apply it for certain specified purposes, an express trust exists.' "[3]

¶22 The language creating an express trust is contained in the progress payments section of the AIA General Conditions. The General Conditions were incorporated by reference in the contracts signed by Westview and Tukwila when they hired Construction Associates. Section 9.6.2 of the General Conditions states:

> *The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled,* reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in a similar manner.[4]

Section 9.6.7 states:

> Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, *payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be held by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner.* Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor, shall create any fiduciary liability or tort liability on the part of the Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor for breach of the requirements of this provision.[5]

---

[3] *State v. Southard,* 49 Wn. App. 59, 63 n.3, 741 P.2d 78 (1987) (quoting *Smith v. Fitch,* 25 Wn.2d 619, 626-27, 171 P.2d 682 (1946)).

[4] (Emphasis added.)

[5] (Emphasis added.)

The contract language evinces an express understanding on the part of the general contractor that it is not to hold the progress payments as its own absolute property but to hold and apply them for certain specified purposes, that is, for the benefit of the subcontractors. Under Washington law, therefore, an express trust is created by the contract language.

¶23 The AIA published a commentary along with the 1997 General Conditions that also supports the position that the contract language establishes a trust. Of section 9.6.2, the commentary states: "This precludes the contractor from using money received for subcontractors' work for other purposes." Furthermore, the commentary explicitly states that section 9.6.7 establishes a trust:

> *This requirement establishes a trust in favor of subcontractors and suppliers of monies received by the contractor by reason of work and materials of its subcontractors and suppliers.* This subparagraph gives subcontractors and suppliers a preference in the event of the contractor's bankruptcy and thereby protects the owner from lien claims which could have been asserted by those entities had they not been furnished with this preference. As the recipient of trust funds, the contractor is under an obligation to properly apply the funds for the account of the subcontractors and suppliers.[6]

¶24 The parts of section 9.6.7 allowing the contractor to commingle funds and immunizing the contractor from liability for breach of fiduciary duty do not, as U.S. Bank contends, preclude a trust or indicate an intention between the parties not to create a trust. The first clause in question allows the general contractor to commingle progress payments with the general contractor's own money: "Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor." The *Restatement (Second) of Trusts* permits this practice: "By the terms of the trust the trustee may be permitted to mingle trust property with his own property. It may be expressly so provided by the terms of

---

⁶ (Emphasis added.)

the trust or the character of the trust may be such as to make this proper."[7] Furthermore, the Washington Supreme Court has stated: "The commingling of trust funds with other funds does not destroy their character as trust funds."[8] As explained in the AIA commentary, this provision exists so general contractors may avoid "accounting and bookkeeping complexities unnecessary to the accomplishment of the purpose of this provision." The provision on commingling does not eviscerate the express trust.

¶25 The second clause in question relieves the general contractor of liability for breach of fiduciary duty or breach of trust: "Nothing contained herein . . . shall create any fiduciary liability or tort liability on the part of the Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor for breach of the requirements of this provision." According to the *Restatement*, such provisions limiting a trustee's liability are permissible so long as they do not offend public policy, and no such grounds are alleged here.[9] The Washington Supreme Court also has held that such immunity clauses do not have the effect of destroying a trust.[10] Furthermore, the Minnesota Legislature has adopted a progress payment trust statute modeled on section 9.6.7,[11] and the Minnesota Court of Appeals recently held

[7] RESTATEMENT (SECOND) OF TRUSTS § 179 cmt. f (1959).

[8] *State v. Comer*, 176 Wash. 257, 263, 28 P.2d 1027 (1934).

[9] *See* RESTATEMENT (SECOND) OF TRUSTS § 222 (1959).

[10] *See Comer*, 176 Wash. at 265 ("We hold that the proper construction of the trust deed is that the immunity clause does not destroy the trust created by the deed . . . .").

[11] Minn. Stat. Ann. § 514.02, subdiv. 1(a) states:

Proceeds of payments received by a person contributing to an improvement to real estate within the meaning of section 514.01 shall be held in trust by that person for the benefit of those persons who furnished the labor, skill, material, or machinery contributing to the improvement. Proceeds of the payment are not subject to garnishment, execution, levy, or attachment. Nothing contained in this subdivision shall require money to be placed in a separate account and not commingled with other money of the person receiving payment or create a fiduciary liability or tort liability on the part of any person receiving payment or entitle any person to an award of punitive damages among persons contributing

that the limitation of liability language did not create a contradiction that rendered the trust language meaningless.[12] The provision limiting the liability of the general contractor for breach of fiduciary duty thus does not negate the trust.

¶26 Therefore, summary judgment was improperly granted if it was based on the legal conclusion that trusts had not been created by the contracts.[13]

*May U.S. Bank be held liable for misappropriating trust funds?*

¶27 In *Wen Chang v. Redding Bank of Commerce*,[14] the California Court of Appeals recently held, "A bank that has knowledge sufficient to require inquiry whether funds deposited by a general contractor to its account with the bank are trust funds cannot, as against the subcontractors, set off the funds to pay an indebtedness owed the bank by the general contractor."[15] This proposition is consistent with the following well-settled rule:

> [I]f a bank actually knows that sums deposited in the account of one of its debtors belong to a third person, it cannot apply such funds against the debtor's obligation to it. A bank is also denied the right to set off a third person's sums in its debtor's account against the debtor's obligation to it where it lacks actual knowledge or notice that the sums belong to a third

---

to an improvement to real estate under section 514.01 for a violation of this subdivision.

The words "in trust" are present in the statute but absent from AIA General Conditions section 9.6.7. However, "[a] trust may be created although the settlor does not use the word 'trust' . . . ." RESTATEMENT (SECOND) OF TRUSTS § 24 cmt. b (1959).

[12] *State v. Bren*, 704 N.W.2d 170 (Minn. Ct. App. 2005).

[13] At oral argument, U.S. Bank contended for the first time that the language in the conditional lien waiver forms used by Construction Associates precludes a finding that the progress payments at issue here were trust funds. Whether the progress payments in fact included funds earmarked for subcontractors and suppliers is a question of fact. Reading the facts in the light most favorable to Westview and Tukwila, as we must, a reasonable trier of fact could conclude that the progress payments included trust funds.

[14] 29 Cal. App. 4th 673, 35 Cal. Rptr. 2d 64 (1994).

[15] *Chang*, 29 Cal. App. 4th at 678.

person, but has knowledge of circumstances sufficient to necessitate inquiry concerning the sums.[16]

¶28 The court in *Chang* held the provisions contained in AIA A201-1987 section 9.6.2 created a constructive trust where the owner of a construction project was the settlor, the general contractor was the trustee, the subcontractors were the beneficiaries, and the progress payments were the trust res.[17] AIA A201-1997 section 9.6.7 was not implicated in the case because it was promulgated at a later date.

¶29 In *Chang*, the bank, upon learning of the general contractor's imminent bankruptcy, set off a debt owed by a general contractor with funds contained in the general contractor's business checking account. In doing so, the bank reversed payment of checks issued by the general contractor to subcontractors from funds provided to it by the owner of the construction project. The court ultimately found in the owner's favor, finding there was a triable issue of fact whether the bank knew facts which, under the circumstances, would lead a reasonably intelligent and diligent person to inquire whether the general contractor was acting as a trustee of the progress payments.

¶30 In this case, there is a triable issue of fact as to whether U.S. Bank knew facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether Construction Associates was acting as a trustee of the progress payments made by Westview and Tukwila. Specifically, Westview and Tukwila have submitted evidence showing that U.S. Bank knew that Construction Associates was a general contractor and that most of its accounts receivable were payments made by property owners for the benefit of subcontractors. They also have submitted evidence showing that U.S. Bank requested

---

[16] B.C. Ricketts, Annotation, *Bank's Right to Apply Third Person's Funds, Deposited in Debtor's Name, on Debtor's Obligation*, 8 A.L.R.3d 235, § 2 (1966).

[17] *Chang*, 29 Cal. App. 4th at 685. *But see In re H&A Constr. Co.*, 65 B.R. 213 (Bankr. D. Mass.1986) (holding that the language presently contained in section 9.6.2 (then section 9.5.2), by itself, did not create a trust).

and received a great deal of financial information from Construction Associates and exercised significant control over its finances. Taken together, such evidence is enough to survive summary judgment on the issue of whether U.S. Bank had knowledge sufficient to require inquiry whether the funds deposited by Construction Associates to its account with the bank were trust funds.

*Did U.S. Bank's use of the progress payments injure Westview and Tukwila?*

¶31 The facts in this case are different from those in *Chang* in one significant respect. In *Chang*, the bank kept the progress payments and dishonored the checks written by the general contractor to the subcontractors. In short, it was undisputed that the bank kept the money to the detriment of the subcontractors. Here, U.S. Bank admittedly seized the Westview and Tukwila progress payments and used them to offset Construction Associates' debt, but at the same time, U.S. Bank issued Construction Associates new loans against the same line of credit.

¶32 Both sides agree that if mishandled trust funds are ultimately accounted for, there can be no liability for breach of trust.[18] However, appellants and respondent contest whether the trust funds taken by U.S. Bank have been accounted for. U.S. Bank argues that the cash collateral account existed merely to facilitate its financing relationship with Construction Associates and that the evidence indicates U.S. Bank loaned Construction Associates amounts far in excess of the progress payments in the days immediately following the seizure of the progress payments. Thus, the argument goes, U.S. Bank cannot be held liable for Construction Associates' failure to pay its subcontractors out of the newly loaned funds. Westview and Tukwila, on the other hand, contend that because by the end of January 2002 U.S. Bank had taken from Construction Associates $670,000 more than it loaned, U.S. Bank cannot establish as a matter of law that its actions did not

---

[18] *In re Estate of Jones*, 152 Wn.2d 1, 16-17, 93 P.3d 147 (2004).

contribute to Westview's and Tukwila's damages. In essence, Westview and Tukwila claim that even if U.S. Bank immediately loaned Construction Associates as much as it took, it repossessed those funds at a later date.

¶33 The fact that U.S. Bank ultimately improved its financial position relative to Construction Associates' loan after having seized the progress payments at issue is enough to send the damages issue to trial. At trial, Westview and Tukwila will have to prove that U.S. Bank's practices damaged them. This will involve complex accounting issues that are best left to a trier of fact.

*Westview's Other Claims*

*Conversion*

¶34 "[C]onversion is the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it."[19] Money may be the subject of conversion in Washington under certain circumstances; however,

> there can be no conversion of money unless it was wrongfully received by the party charged with conversion, or unless such party was under obligation to return the specific money to the party claiming it.[20]

Furthermore,

> "[t]here is nothing in the nature of money making it an improper subject of [conversion] so long as it is capable of being identified, as when delivered at one time, by one act and in one mass, or when the deposit is special and the identical money is to be kept for the party making the deposit, or when wrongful possession of such property is obtained."[21]

---

[19] *Pub. Util. Dist. No. 1 of Lewis County v. Wash. Pub. Power Supply Sys.*, 104 Wn.2d 353, 378, 705 P.2d 1195 (1985).

[20] *Pub. Util. Dist. No. 1 of Lewis County*, 104 Wn.2d at 378 (citing *Davin v. Dowling*, 146 Wash. 137, 140-41, 262 P. 123 (1927)).

[21] *Davin*, 146 Wash. at 140-41 (citations omitted) (quoting *Hazelton v. Locke*, 104 Me. 164, 71 A. 661 (1908)).

¶35 Here, Westview's progress payments were special deposits to be held in trust by Construction Associates for the benefit of the subcontractors. U.S. Bank took possession of that money and used it to offset Construction Associates' debt with the bank. As in the case of the trust issue, whether U.S. Bank's actions caused Westview's damages is a question of fact to be left to a jury. Westview's conversion claim survives summary judgment.

*Concerted Action*

¶36 Westview alleges, "U.S. Bank committed the tort of concerted action." But concerted action is not a tort in itself, but is a theory of liability.[22] For a defendant to be held liable under the theory of concerted action, the plaintiff must show a tacit agreement among defendants to perform a tortious act.[23] More specifically, the plaintiff must show that the defendant:

"(a) does a tortious act in concert with the other or pursuant to a common design with him, or

"(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

"(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."[24]

Westview alleges U.S. Bank acted in concert with Construction Associates to misappropriate the progress payments. It appears that breach of trust and/or conversion are the underlying torts in Westview's concerted action argument.

¶37 The evidence indicates that U.S. Bank's seizure of the progress payments was subject to a forbearance agreement between U.S. Bank and Construction Associates. This evidence is enough to establish an issue of material fact as

---

[22] *Martin v. Abbott Labs.*, 102 Wn.2d 581, 596, 689 P.2d 368 (1984).

[23] *Martin*, 102 Wn.2d at 596.

[24] *Martin*, 102 Wn.2d at 596 (quoting RESTATEMENT (SECOND) OF TORTS § 876(a)-(c), at 315 (1977)).

to whether the parties converted the funds in concert with each other or pursuant to a common design. Westview should be allowed to argue concerted action theory at trial, although it still will need to prove an underlying tort to succeed.

*Consumer Protection*

¶38 An action under the CPA requires the plaintiff to establish the following elements: " '(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to the plaintiff in his or her business or property; and (5) causation.' "[25] Regarding the first element, "[a]n act or practice is unfair or deceptive for purposes of the CPA if it has the capacity to deceive a substantial portion of the public."[26] In support of this element, Westview merely states: "There is no reason to believe that U.S. Bank has not engaged in a similar course of conduct towards other general contractors in financial difficulty, property owners and subcontractors." It is equally true that there is no reason to believe that U.S. Bank's alleged misappropriation of the trust funds had the capacity to deceive a substantial portion of the public because Westview has provided no evidence or argument to support that position.[27]

¶39 More fundamentally, Westview has failed to show that the alleged act or practice of applying the progress payments to offset its loan to Construction Associates deceived or had the capacity to deceive Westview, much less

---

[25] *Edmonds v. John L. Scott Real Estate, Inc.*, 87 Wn. App. 834, 845, 942 P.2d 1072 (1997) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986)).

[26] *Edmonds*, 87 Wn. App. at 845 (citing *Hangman Ridge*, 105 Wn.2d at 785).

[27] *See Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, L.L.P.*, 110 Wn. App. 412, 40 P.3d 1206 (2002) (Mere speculation that an alleged unfair or deceptive act had the capacity to deceive a substantial portion of the public is insufficient to survive summary judgment.).

a substantial portion of the public.[28] There is no evidence that U.S. Bank made any representations to Westview regarding the alleged conduct. If what Westview claims is true, U.S. Bank simply took the trust money from Construction Associates to offset its loan to Construction Associates, causing Westview damages. The trial court therefore was correct in dismissing Westview's CPA claim because Westview failed to adequately show for summary judgment purposes that U.S. Bank's acts or practices had the capacity to deceive a substantial portion of the public.

¶40 For the above reasons, the trial court's orders granting U.S. Bank summary judgment on the misappropriation of trust funds claims raised by Westview and Tukwila are reversed, and the trial court's order denying Tukwila's cross motion for summary judgment on the same issue is affirmed; the trust fund issues are thus remanded for a trial. Furthermore, the trial court's order granting U.S. Bank's motion for summary judgment on Westview's conversion and concerted action claims are reversed and the matters remanded for a trial. Finally, the trial court's order granting U.S. Bank summary judgment on Westview's consumer protection claim is affirmed.

BECKER and DWYER, JJ., concur.

---

[28] *Nelson v. Nat'l Fund Raising Consultants, Inc.*, 120 Wn.2d 382, 842 P.2d 473 (1992) ("The necessary showing is that a given act or practice has a *capacity* to deceive.").