[No. 29812-4-III.    Division Three.    October 30, 2012.]

Daniel Brian Strange, *Appellant*, v. Spokane County et al., *Respondents*.

*Mary E. Schultz* (of *Mary Schultz Law PS*), for appellant.

*Hugh T. Lackie* and *Heather Yakely* (of *Evans Craven & Lackie PS*), for respondents.

¶1 SWEENEY, J. — This appeal follows a defense verdict in a suit for excessive use of force by a police officer. The

plaintiff was shocked with a stun gun by a Spokane County sheriff's deputy following a run-in with the deputy that followed a traffic stop. The plaintiff was a passenger in the car. The assignments of error include challenges to the court's various rulings on evidence and the refusal of the court to give certain proposed instructions on limitations on the use of force. But the most significant challenge here on appeal is to the court's refusal to impose liability as a matter of law or instruct based on a recent Ninth Circuit Court of Appeals decision that limits the use of stun guns. *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010). We conclude that the 2010 Ninth Circuit decision does not apply to the events here, which took place in 2006. And we conclude that the court did not abuse its discretion in its rulings on evidence, nor did it abuse its discretion in its instructions to the jury. We therefore affirm the judgment entered on the verdict.

## FACTS

¶2 Spokane County Sheriff's Deputy Jeffrey Welton stopped a car for accelerating rapidly and making several improper turns during the early morning hours of January 22, 2006. Deputy Welton approached the driver's door. Kelly Garber, the driver, opened the door instead of rolling the window down. Deputy Welton requested Ms. Garber's driver's license and vehicle registration. He attempted to explain the reason for the stop. Daniel Brian Strange was seated in the front seat. He is Ms. Garber's boyfriend and the owner of the car. He became belligerent. Deputy Welton and Mr. Strange argued back and forth over whether Mr. Strange was wearing his seat belt. Deputy Welton collected Ms. Garber's and Mr. Strange's identifications, instructed them to remain in the car, and closed the door with some force.

¶3 Mr. Strange got out of the car. He took two steps forward and yelled, "Don't slam my door." Report of Proceed-

ings (RP) (Jan. 13, 2011) at 819. Deputy Welton drew his firearm and called for backup. He repeatedly ordered Mr. Strange to get back into the car. Deputy Welton eventually holstered his firearm and pulled out his stun gun. He advised Mr. Strange that if he did not get back into the car he would be arrested. Deputy Welton heard Mr. Strange say something in response and understood it to be defiant and challenging. He then told Mr. Strange that he was under arrest and ordered him to turn around with his hands behind his back. Mr. Strange started to reenter the car. Deputy Welton discharged his stun gun into Mr. Strange's back. Deputy Welton arrested Mr. Strange for resisting arrest and obstructing a public servant.

¶4 Mr. Strange sued Deputy Welton and Spokane County for excessive use of force in violation of his civil rights under 42 U.S.C. § 1983 and for arrest without probable cause. He specifically alleged that Deputy Welton misused his law enforcement powers when he used a stun gun to effect a misdemeanor arrest. And he alleged that Spokane County knowingly maintained a custom and policy of deliberate indifference to the rights and safety of its citizens.

¶5 The matter proceeded to a jury trial in January 2011. The parties presented extensive testimony regarding use of force and the internal procedures used when dealing with such police actions. Spokane County Sherriff's Sergeant Dale Golman testified that he responded to the scene on the night that Mr. Strange was shocked with a stun gun. Counsel for Mr. Strange asked Sergeant Golman whether Deputy Welton's incident report indicated how many times Deputy Welton pulled the trigger on the stun gun. He responded that Deputy Welton's report did not contain that information but then produced the stun gun dataport recording from the incident. The stun gun dataport records "triggering events" in five-second cycles, which can later be downloaded. He testified that the document showed that Deputy Welton cycled his stun gun only one time. The dataport recording showed a final triggering discharge

occurring on January 22, 2006 at 1:55 a.m., which was consistent with the stun gun's use here. Mr. Strange moved for sanctions against the county on the ground that the dataport recording was incomplete and should have been produced earlier. The court denied the request.

¶6 Mr. Strange also maintained throughout trial that Spokane County had failed to create a "use of force report" as required by department policy. Midway through trial, counsel for Spokane County produced what it called a "database entry form." The document was titled "Unknown-Internal Affairs, Use of Force." Ex. P-145. Mr. Strange requested a mistrial on the ground that the county had once again engaged in discovery abuses. The court concluded that the document should have been produced in response to Mr. Strange's prior interrogatories but refused to grant a mistrial or impose sanctions: "I am satisfied that, through proper examination of witnesses, the nature of this document can be presented, can be argued by both sides as to what it represents." RP (Jan. 10, 2011) at 407-08.

¶7 Spokane County moved for judgment as a matter of law following the close of Mr. Strange's case in chief. Spokane County argued that Mr. Strange had failed to show that (1) the challenged conduct was the result of some custom or policy maintained by the county, (2) the challenged conduct was the result of some deliberate choice or failure to train by the county, or (3) the challenged conduct was ratified in some way by a supervisor or representative of the county. The court granted the motion and dismissed all municipal liability claims against Spokane County. The court specifically concluded that there was no official policy or policy maker that chose to use such force, no program-wide failure to train the officers on how and when to use force, and no affirmative decision to ratify the deputy's conduct.

¶8 At the close of trial, Mr. Strange moved for judgment as a matter of law as to excessive force and false arrest for the obstructing and resisting charges. He first argued that

the acts of standing next to his car and shouting at Deputy Welton did not amount to obstructing. Mr. Strange argued that there was no evidence that he even heard Deputy Welton's arrest order and, even if he did, getting back into the vehicle was not an intentional attempt to prevent arrest. The court ruled that Deputy Welton had the authority to make the arrest for the misdemeanors committed in his presence and state law authorized him to use force to perform that "legal duty," and the court denied the motion. The court ruled that whether the deputy had probable cause to make the arrest was a question for the jury. Finally, the court ruled that the Ninth Circuit Court of Appeals case of *MacPherson*, 630 F.3d 805, did not apply a new standard for the use of stun guns retroactively:

> So my ruling is that *MacPherson* can't apply as the law governing this case because it came four years after the fact and, therefore, represents a ruling that can only be applied to other cases prospectively and not retroactively.

RP (Jan. 24, 2011) at 1634.

¶9 The jury found that Deputy Welton did not use unreasonable force and did not conduct the arrest without probable cause. Mr. Strange moved for a new trial and judgment notwithstanding the verdict against both Deputy Welton and Spokane County. The court denied the motions. The court concluded that most of Mr. Strange's arguments had already been properly addressed during trial. The court did address the two claims of discovery violations. The court first characterized Spokane County's report as an administrative entry rather than a classic use of force report: "In my view, it didn't add anything one way or the other in terms of anything new in the case. [I]t is not a material omission here that justifies the order for a new trial." RP (Mar. 4, 2011) at 15. The court next dismissed the argument that the stun gun dataport record would have proved multiple trigger pulls: "There was never anything more than pure speculation here that the [stun gun] was exercised

more than once." RP (Mar. 4, 2011) at 17. The court then entered judgment on the verdict.

¶10 Mr. Strange appeals.

## DISCUSSION

APPLICATION OF *BRYAN v. MACPHERSON*

¶11 Mr. Strange argues that the court erred when it concluded that the Ninth Circuit Court of Appeals case of *Bryan v. MacPherson*[1] did not apply retroactively. And the court erred when it concluded that Washington law provided the controlling authority for the use of force in making the arrest and then denied his motion for judgment as a matter of law.

¶12 The court must grant a motion for judgment as a matter of law if, after viewing the evidence in the light most favorable to the nonmoving party, the court determines that there is no substantial evidence or reasonable inferences from the evidence to support a verdict for the nonmoving party. *Goodman v. Goodman*, 128 Wn.2d 366, 371, 907 P.2d 290 (1995). We review the denial of a motion for judgment as a matter of law to determine whether the evidence presented was sufficient to support the jury's verdict. *Wright v. Engum*, 124 Wn.2d 343, 356, 878 P.2d 1198 (1994). And here the issue presented turns on a question of law—does *MacPherson* apply or does it not. That is a question we will review de novo. *Lewis v. Simpson Timber Co.*, 145 Wn. App. 302, 322, 189 P.3d 178 (2008); *see Berrocal v. Fernandez*, 155 Wn.2d 585, 590, 121 P.3d 82 (2005).

---

[1] 630 F.3d 805. *Bryan* involved the use of a stun gun on a young man in boxer shorts from 20 feet away during a traffic stop for a seat belt infraction. *Id.* at 822. The man fell down face first and the asphalt cracked four teeth and drove in a stun gun probe so deeply it needed surgical removal. *Id.* The *Bryan* court concluded that stun guns "used in dart-mode constitute an intermediate, significant level of force that must be justified by the government interest involved." *Id.* at 826. It would appear from the holding that the use of a stun gun in dart mode on an unarmed misdemeanant who is noncompliant, but not overtly threatening, or posing any other concern for the safety of the officer or the subject, might be unreasonable.

¶13 In *MacPherson*, the Ninth Circuit applied, retroactively, its holding that use of a stun gun in dart mode was an intermediate use of force that was not justified in the course of a misdemeanor arrest of a nonviolent traffic code offender. The decision is then persuasive, if not controlling, authority on the Fourth Amendment issue and it was error for the trial court to conclude otherwise. *See, e.g., State v. Robinson*, 2003 MT 364 ¶ 14, 319 Mont. 82, 82 P.3d 27, 30 (in passing on federal constitutional questions, state courts and lower federal courts have the same responsibility and occupy the same position); *People v. Bradley*, 1 Cal. 3d 80, 86, 460 P.2d 129, 81 Cal. Rptr. 457 (1969) (Ninth Circuit's construction of the federal constitution is not binding on state court but is persuasive and entitled to great weight).

¶14 But any error by the court in assessing the precedential significance of *MacPherson* was harmless here because *MacPherson* further held that a nonviolent traffic violator's right not to be subjected to an electronic stun weapon was not "clearly established" in July 2005. 630 F.3d at 833. *MacPherson* is sufficiently persuasive on this aspect of qualified immunity that we need not reach the constitutional question.

¶15 In *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), the United States Supreme Court held that in determining whether a police officer alleged to have violated a constitutional right is entitled to qualified immunity under 42 U.S.C. § 1983, two questions must be answered. The first is whether the officer's conduct violated a constitutional right, an element of the plaintiff's claim. This question is answered by viewing the evidence in the light most favorable to the party asserting injury where dismissal is sought on qualified immunity grounds. The second question, specific to qualified immunity, is whether the constitutional right was clearly established given the specific context of the case before the court. In *Saucier*, the Court held that the two questions must be answered in that order, for "[i]n the course of determining whether a consti-

tutional right was violated . . . a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case." 533 U.S. at 201. The inflexible two-step *Saucier* protocol was criticized as unnecessary and unwise, particularly given cases like this one, where the second question is easier to answer than the first. The United States Supreme Court receded from the requirement in *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009), holding that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first."

¶16 In *MacPherson*, the Ninth Circuit elaborated further on the permitted use of stun guns by answering the constitutional question first. To determine whether Officer MacPherson's use of the stun gun violated the Fourth Amendment's prohibition of unreasonable seizures, it examined whether his actions were objectively reasonable in light of the facts and circumstances confronting him, balancing " 'the nature and quality of the intrusion on the [plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake.' " *MacPherson*, 630 F.3d at 823 (internal quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). Analyzing the nature and quality of the intrusion, it concluded that use of a stun gun in dart mode constituted an " 'intermediate or medium, though not insignificant, quantum of force.' " *Id.* at 826 (quoting *Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1168 (E.D. Cal. 2008)). It then held that the use of intermediate force was not justified in the context of what was, at most, erratic behavior and passive resistance by an unarmed, stationary driver, in the course of a stop for a misdemeanor traffic offense. It implicitly applied its holding retroactively. "Retroactive application, by which a decision is applied to both the litigants before the court and all cases arising prior to

and subsequent to the announcing of the new rule, is 'overwhelmingly the norm.' " *Lunsford v. Saberhagen Holdings, Inc.*, 166 Wn.2d 264, 270, 208 P.3d 1092 (2009) (internal quotation marks omitted) (quoting *Robinson v. City of Seattle*, 119 Wn.2d 34, 74, 830 P.2d 318 (1992)). It " 'is in keeping with the traditional function of the courts to decide cases before them based upon their best current understanding of the law.' " *Robinson*, 119 Wn.2d at 74 (quoting *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 534, 111 S. Ct. 2439, 115 L. Ed. 2d 481 (1991)).

¶17 The *MacPherson* court then turned to the second question: whether the constitutional right it had found to be violated (viewing the facts in the light most favorable to Mr. Bryan) was, at the time of the traffic stop, clearly established in light of the specific context of the case. It concluded that Officer MacPherson was on notice that it was unreasonable to deploy intermediate force in the traffic stop context with which he was presented. But it held that it was not clearly established at that time that use of a stun gun constituted use of intermediate force. Rather, as of July 24, 2005, the date of the arrest,

> there was no Supreme Court decision or decision of our court addressing whether the use of a taser . . . in dart mode constituted an intermediate level of force. Indeed, before that date, the only statement we had made regarding tasers in a published opinion was that they were among the "variety of non-lethal 'pain compliance' weapons used by police forces." *San Jose Charter of Hells Angels Motorcycle Club* [*v. City of San Jose*], 402 F.3d [962,] 969 n.8 [9th Cir. 2005)]. And, as the Eighth Circuit has noted, "[t]he Taser is a relatively new implement of force, and case law related to the Taser is developing." *Brown v. City of Golden Valley*, 574 F.3d 491, 498 n.5 (8th Cir. 2009). Two other panels have recently, in cases involving different circumstances, concluded that the law regarding tasers is not sufficiently clearly established to warrant denying officers qualified immunity. *Mattos v. Agarano*, 590 F.3d 1082, 1089-90 (9th Cir. 2010); *Brooks v. City of Seattle*, 599 F.3d 1018, 1031 n.18 (9th Cir. 2010).

> Based on these recent statements regarding the use of tasers, and the dearth of prior authority, we must conclude that a reasonable officer in Officer MacPherson's position could have made a reasonable mistake of law regarding the constitutionality of the taser use in the circumstances Officer MacPherson confronted in July 2005. Accordingly, Officer MacPherson is entitled to qualified immunity.

*MacPherson*, 630 F.3d at 833 (fifth alteration in original).

¶18 *MacPherson* is significant to other excessive force cases such as this one in three ways, only two of which involve retroactive application. Is the use of a stun gun in dart mode a use of intermediate level force? *MacPherson* says yes, and to the extent its holding is controlling or persuasive, the answer is true as to past police encounters as well as future ones. Should a reasonable police officer have known, before the decision in *MacPherson*, that the use of a stun gun in dart mode was intermediate force? *MacPherson* says no, and to the extent its holding is controlling or persuasive, the answer is true as to all police encounters taking place before it provided guidance. These are the two matters involving retroactive application. Its third significance is that for police encounters taking place after the date of the decision—but only those encounters— the very existence of the decision may compel a conclusion that the right of an unarmed, stationary misdemeanant to be free of stun-gun-induced cooperation has been clearly established. But that has nothing to do with retroactivity. To the extent this third, prospective-only significance of the case was relied upon to conclude that *MacPherson*'s holdings do not apply retroactively, the court erred.

¶19 The court's refusal to grant Mr. Strange's request for judgment as a matter of law should be affirmed, however, because *MacPherson* is persuasive authority that as of Deputy Welton's encounter with Mr. Strange in January 2006, it was not clearly established that use of a stun gun in dart mode constituted intermediate force. Indeed, in response to a motion for an en banc hearing in *MacPherson*,

three members of the Ninth Circuit court dissented from denial of the requested hearing. 630 F.3d at 815-21. A reasonable police officer in Deputy Welton's position could have made a reasonable mistake of law regarding the constitutionality of stun gun use in the circumstances he encountered in January 2006.

QUALIFIED IMMUNITY

¶20 Mr. Strange insists that we should not affirm the court on this alternate ground, arguing that by proceeding to trial the county and its deputy waived the qualified immunity argument, citing *Pearson*, 555 U.S. 223; *Saucier*, 533 U.S. 194; *Mitchell v. Forsyth*, 472 U.S. 511, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985); and *Babcock v. State*, 116 Wn.2d 596, 636, 809 P.2d 143 (1991) (Andersen, J., concurring in part, dissenting in part). Appellant's Reply Br. at 4-5. Those cases state that because qualified immunity is intended as immunity from suit rather than a mere defense to liability, " 'it is *effectively lost* if a case is erroneously permitted to go to trial,' " *Pearson*, 555 U.S. at 231 (emphasis added) (quoting *Forsyth*, 472 U.S. at 526), the import being that a defendant is denied the protection from inconvenience and expense intended by immunity if a claim is not dismissed at the earliest possible time. The cited decisions do not hold that a defendant who fails to seek or secure dismissal of a § 1983 claim before trial waives immunity. It is not waived. *See Hill v. McKinley*, 311 F.3d 899, 902 (8th Cir. 2002) (although defendants did not receive the benefit of early resolution by failing to assert immunity by motion, they did not thereby waive the defense); *cf. Narducci v. Moore*, 572 F.3d 313, 325 (7th Cir. 2009) (defense of qualified immunity to Title III claims not raised by summary judgment motion remained available as a basis for a motion for judgment as a matter of law during trial or, depending on jury's verdict, as a basis for appeal).

WASHINGTON—USE OF FORCE

¶21 Mr. Strange also contends that Washington law supported his motion for judgment as a matter of law. He contends that an officer's right to use force on a misdemeanor arrest is limited by two statutes—RCW 9A.16.020 ("Use of force—when lawful") and RCW 10.31.050 ("Officer may use force"). He contends that the statutes specifically mention the use of force to carry out a felony arrest, but not a misdemeanor arrest. He further contends that there is no "legal duty" to arrest for a misdemeanor. That is, whether to arrest or not is discretionary.

¶22 An officer is allowed to make a warrantless arrest for a misdemeanor or gross misdemeanor "when the offense is committed in the presence of the officer." RCW 10.31.100. Deputy Welton arrested Mr. Strange for the misdemeanor offenses of resisting arrest and obstructing a law enforcement officer. RCW 9A.76.040, .020. Mr. Strange committed those offenses in Deputy Welton's presence. Deputy Welton then had authority to make the warrantless misdemeanor arrest.

¶23 Mr. Strange argues that Deputy Welton did not have the authority to use force. RCW 9A.16.020 defines the lawful use of force in Washington. It provides that force is lawful "[w]henever necessarily used by a public officer in the performance of a legal duty, or a person assisting the officer and acting under the officer's direction." RCW 9A.16.020(1). Mr. Strange contends that the mere authority to make a misdemeanor arrest does not equate to a legal duty to make that arrest. He notes that subsection (2) of the statute specifically authorizes the use of force for arresting a person who has committed a felony but fails to mention misdemeanor arrests. RCW 9A.16.020(2).

¶24 The court here concluded that "since one has an ability to arrest for a misdemeanor or a gross misdemeanor, it falls, in my view, within the definition of legal duty under [RCW] 9A.16.020." RP (Jan. 24, 2011) at 1631. We agree.

Officer Welton has the duty to arrest people who commit crimes. RCW 36.28.010(1) (sheriff or deputies "[s]hall arrest and commit to prison all persons who break the peace, or attempt to break it, and all persons guilty of public offenses"). That authority is limited in the case of misdemeanors to crimes committed in the deputy's presence. RCW 10.31.100. But that limitation does not detract from his duty, in the first place, to arrest people who commit crimes. The fact that he can exercise some discretion in the case of misdemeanors does not distract from his statutory obligation—duty—to enforce the law in the first place.

¶25 RCW 10.31.050 provides that an officer may, after giving notice of an intention to arrest, use all necessary means to effect that arrest if the suspect flees or forcibly resists arrest. Mr. Strange contends that he did not receive notice of the arrest and he did not flee or forcibly resist that arrest. But we view the evidence here in a light most favorable to the county, not Mr. Strange. *Goodman*, 128 Wn.2d at 371. And here the jury rejected Mr. Strange's version of things.

¶26 Mr. Strange claims that he did not hear Deputy Welton announce that he was under arrest and then direct him to turn around with his hands behind his back. He testified that he was simply complying with the previous command to get back in the car. He argues that sitting back in the car does not constitute fleeing. While this may be true, it is beside the point. Deputy Welton did not know Mr. Strange's motives. He simply knew that Mr. Strange did not comply with a lawful command and was belligerent. He had no obligation to ensure that Mr. Strange heard his command. It is what Deputy Welton knew, not Mr. Strange's explanation, that is material to the officer's justification for what he did. The court properly concluded that any remaining factual issues surrounding the arrest were properly left to the jury.

¶27 The court then did not err in denying Mr. Strange's motion for judgment as a matter of law. Washington law provided the appropriate standard for the use of force here.

Dismissal of Spokane County as a Matter of Law

¶28 42 U.S.C. § 1983 provides that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . for redress.

██ ██ ¶29 To establish a § 1983 claim against a municipality, a plaintiff must (1) identify a specific policy or custom; (2) show that the policy was sanctioned by those responsible for making that policy; (3) show a constitutional deprivation; and (4) establish a causal connection between the custom or policy and the constitutional deprivation. *Baldwin v. City of Seattle*, 55 Wn. App. 241, 248, 776 P.2d 1377 (1989). The county is liable only if a constitutional deprivation directly resulted from a county policy. *Monell v. Dep't of Soc. & Health Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *Mission Springs, Inc. v. City of Spokane*, 134 Wn.2d 947, 968, 954 P.2d 250 (1998). "If the police did not use excessive force in making the arrest, there can be no municipal liability." *Estate of Lee v. City of Spokane*, 101 Wn. App. 158, 173, 2 P.3d 979 (2000). "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) (emphasis omitted).

¶30 The jury here concluded that Deputy Welton did not use excessive force and the county then cannot perforce be liable.

¶31 We affirm the judgment entered on the verdict.

¶32 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

SIDDOWAY, A.C.J., and BROWN, J., concur.

Reconsideration denied January 16, 2013.

Review denied at 177 Wn.2d 1016 (2013).