

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| HARLAN D. DOUGLASS & MAXINE H. DOUGLASS, husband and wife, | ) ) ) | No. 36134-9-III |
| Respondents, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| BRYAN J. REILLY, an individual, and DOES 1-10, | ) ) ) ) | |
| Appellant. | ) | |

PENNELL, C.J. — Bryan Reilly appeals a jury verdict finding him liable for

unlawfully converting property owned by his former employer, Harlan Douglass.

We affirm.

FACTS[1]

Harlan Douglass is a wealthy real estate developer who owned a home and acreage

in Colbert, Washington. As a result of childhood experiences during the great depression,

---

[1] Given the nature of the claims raised on appeal, the following facts are presented in the light most favorable to the Douglasses, who prevailed at trial. *Strange v. Spokane County*, 171 Wn. App. 585, 592, 287 P.3d 710 (2012).

Mr. Douglass developed a mistrust of banks and had a habit of stashing away large sums of cash in shoeboxes, hidden inside the family home. The cash was primarily large-denomination bills. By 2014, Mr. Douglass had amassed four boxes full of cash. A tally of one of the boxes added up to $264,900. Given the boxes all appeared similar in size and content, it was estimated the four boxes contained approximately $1 million.[2]

In addition to the cash, Mr. Douglass kept other valuables in his home, including diamond rings, gold coins, and Rolex watches.

Bryan Reilly grew up near Mr. Douglass and his family socialized with the Douglasses. When Mr. Reilly entered his teenage years, he began performing odd jobs for the Douglasses and was paid through the family business. Mr. Reilly's tasks included retrieving mail, letting workers in for repairs, interacting with housekeepers, and generally protecting Mr. Douglass's house. Mr. Reilly was entrusted with a remote control letting him open the gate leading to Mr. Douglass's house and a garage door opener. Tax records for 2013 and 2014 indicate Mr. Reilly had an income of less than $10,000 per year.

In 2013, Mr. Reilly began purloining money and absconding with other valuable items from the Douglass residence, then selling the items for cash. In March 2014, Mr.

---

[2] A second box was counted, but there was no written tally.

2

Reilly obtained two diamond rings, which he then sold for $20,300.[3] In December 2013,

Mr. Reilly appropriated two Rolex watches, which were sold for $9,300.[4] Mr. Reilly's

bank records indicate he deposited money from the sale of Mr. Douglass's valuables into

his bank account and then used the funds in his account to secure loans and purchases of

high-end vehicles and boats. Throughout 2013 and 2014, Mr. Reilly's illegal conduct

went undetected.[5]

At some point in early 2015, Mr. Reilly arranged for a housekeeper to begin

cleaning the Douglass home. During one of the cleaning sessions, the housekeeper

stumbled upon Mr. Douglass's shoeboxes full of cash. The discovery made the

housekeeper nervous. She immediately placed calls to Mr. Reilly and Mr. Douglass.

Mr. Reilly was the first to respond. He advised he knew about the shoeboxes and he urged

the housekeeper not to tell Mr. Douglass about her discovery. The housekeeper did not

---

[3] At trial, Mr. Reilly claimed Mr. Douglass gave him one of the rings and he found the other one (the more expensive one) on the side of the road. This testimony was inconsistent with the testimony from the jeweler who purchased the two rings. The jeweler testified that Mr. Reilly claimed to have inherited the rings. The jury was entitled to reject as not credible Mr. Reilly's inconsistent statements about how he obtained the rings.

[4] At trial, Mr. Reilly claimed Mr. Douglass gave him the two watches. He told the jeweler who purchased the watches that they had been inherited. The jury was free to reject Mr. Reilly's inconsistent statements as not credible.

[5] In addition to the rings and watches, Mr. Reilly admitted to selling several of Mr. Douglass's gold coins. Mr. Reilly claims he had permission to make these sales.

comply. The housekeeper informed Mr. Douglass of what she had found and requested the money be secured in a safe.

After the housekeeper's discovery, the shoeboxes were moved to a safe deposit box. Meanwhile Mr. Douglass commissioned a custom safe for his valuables. Upon completion, the safe was placed in Mr. Douglass's basement. Mr. Douglass's son and daughter-in-law helped move the shoeboxes of money into the safe. Mr. Douglass had a difficult time with the safe's combination. The combination code was written on a sticky note and placed in a medicine cabinet. At some later point, it appears the sticky note with the combination was relocated to a kitchen counter top.

In September 2015, Mr. Douglass left town for a trip to Paris. During his absence, Mr. Reilly was tasked with facilitating the installation of a security system in the Douglass home. Once armed, the security system's use of different key fobs and pass codes would enable Mr. Douglass to track various authorized individuals who came and went from his home. Mr. Reilly received a fob as an authorized individual, as did members of Mr. Douglass's family. According to the alarm company, Mr. Douglass's alarm system was fully operable and set to go live on September 24, 2015.

---

The jury was free to find this claim not credible.

On September 24, 2015, Mr. Reilly contacted the housekeeper and asked her to perform a last-minute cleaning. Mr. Reilly told the housekeeper he would meet her at the house on September 25 to explain the new alarm system. Because of the scheduled house cleaning, Mr. Reilly did not activate the house alarm on September 24. However, Mr. Reilly did not show up on the 25th as planned. The housekeeper proceeded to clean the house and left around noon or 1:00 pm. The house was not armed when the housekeeper left.

Mr. Reilly left his parents' home at 2:00 pm on September 25. At approximately 5:02 p.m.,[6] Mr. Reilly arrived at Hills Resort in Priest Lake, Idaho. A direct trip from Colbert to Hills Resort would typically last 1.5 hours. September 25 was a Friday. Mr. Reilly spent the weekend at Hills Resort.

On Saturday, September 26, Mr. Douglass's home was discovered to have been burglarized. The safe was open and the shoeboxes of cash were missing. A detective dispatched to the scene found the circumstances suspicious. There was no evidence of forced entry. A house window had been left open, but the placement of the window screen indicated the window had been opened from inside, not outside. The detective

---

[6] Mr. Reilly presented the jury with evidence that he arrived at 4:02 p.m. The jury was not required to accept this information and was free to accept testimony from Mr. Douglass's forensic expert that the actual arrival time was 5:02 p.m.

surmised the burglary was an inside job. According to the detective, the only potential insiders were Mr. Douglass's son, his daughter-in-law, the house cleaner, and Mr. Reilly. The detective's subsequent investigation ruled out all of the aforementioned insiders except for Mr. Reilly.

Mr. Reilly met with Mr. Douglass's son and daughter-in-law after he returned home from Hills Resort. The three decided to investigate the grounds surrounding Mr. Douglass's property to see if the intruder left any evidence. A search took place on Sunday, September 27, with no results. On Monday, September 28, Mr. Reilly went out to Mr. Douglass's property with his four-wheeler. He sent a text message to Mr. Douglass's daughter-in-law, advising he had spotted an unoccupied vehicle parked near the Douglass house. Mr. Reilly later called Mr. Douglass's daughter-in-law to report he found a shoebox lid bearing a note with a tally of funds. The lid clearly came from one of Mr. Douglass's cash boxes. The son and daughter-in-law soon arrived at the property to help investigate.

Once Mr. Douglass's son and daughter-in-law caught up with Mr. Reilly, the three began searching the area around where Mr. Reilly said he found the shoebox lid. Nothing was discovered. It was beginning to get dark. Mr. Douglass's son and daughter-in-law indicated they were going to leave, but Mr. Reilly said he wanted to check one more area.

Shortly thereafter, Mr. Reilly came back toward Mr. Douglass's son and daughter-in-law, yelling he had found something. He claimed he could see "50s and 100s." Report of Proceedings (RP) (Apr. 25, 2018) at 1595. Mr. Reilly then accompanied Mr. Douglass's son and daughter-in-law to the site of his alleged discovery.

At the discovery site, Mr. Douglass's son and daughter-in-law could see a white plastic bag, buried in pine needles. The bag looked like it might contain garbage. No money was visible. Mr. Reilly insisted they look inside the bag. Mr. Douglass's daughter-in-law poked into the bag and still saw nothing. Only after it was torn open was it possible to see the bag contained a large amount of money. According to a later tally, the money in the bag totaled $357,252. Mr. Douglass's family surmised the money in the bag came from one of the stolen boxes. The remaining cash was never recovered.

## PROCEDURE

Mr. Douglass sued Mr. Reilly for conversion by theft of the money from the safe. The complaint was later amended to include charges of conversion by theft of other property on numerous occasions from 2013 through 2015.

During the pretrial phase of the case, the trial court made two rulings pertinent to this appeal. First, the court denied Mr. Reilly's motion to bifurcate the multiple conversion claims. Second, the court granted Mr. Douglass's motion in limine to preclude

evidence that Mr. Reilly had not been criminally charged with theft. In granting the motion, the court noted it would also "probably" sustain an objection to any testimony that Mr. Reilly had been charged criminally, should such evidence be elicited at trial. RP (Apr. 6, 2018) at 85-86.

The trial proceedings lasted three weeks. During trial, Mr. Douglass's attorney asked Mr. Reilly's mother if she was aware Mr. Reilly had been charged with six felonies "associated with the theft of property from Harlan and Maxine Douglass." RP (Apr. 17, 2018) at 238. Mr. Reilly immediately objected to this question and moved for a mistrial on the grounds that Mr. Douglass violated a previous court order on the motion in limine. The trial court sustained Mr. Reilly's evidentiary objection but denied the mistrial motion.

At the close of Mr. Douglass's case-in-chief, Mr. Reilly made a motion for a directed verdict as to the theft from the safe, arguing insufficient evidence. The trial court denied the motion.

The jury returned a verdict in favor of Mr. Douglass. In regard to the theft from the safe, the jury found Mr. Reilly had converted cash in the amount of $605,148.

Mr. Reilly timely appeals.

ANALYSIS

*Sufficiency of the evidence*

Mr. Reilly contends the trial court erroneously denied his motion for a directed verdict under CR 50(a)(1) because Mr. Douglass failed to produce sufficient evidence that he converted money from Mr. Douglass's safe. Reviewing the record de novo, *Paetsch v. Spokane Dermatology Clinic, P.S.*, 182 Wn.2d 842, 848, 348 P.3d 389 (2015), we disagree.

To establish conversion, a plaintiff must prove, by preponderance of the evidence, that the defendant: (1) willfully interfered with chattel, (2) the interference was without lawful justification, (3) the plaintiff was entitled to the chattel, and (4) the plaintiff was deprived possession of the chattel due to the interference. *Pub. Util. Dist. No. 1 of Lewis County v. Wash. Pub. Power Supply Sys.*, 104 Wn.2d 353, 378, 705 P.2d 1195, 713 P.2d 1109 (1985). In short, "conversion means to take and keep another's property." *Repin v. State*, 198 Wn. App. 243, 270, 392 P.3d 1174 (2017). Money, just like any other piece of property, can be the subject of a conversion action so long as it is capable of identification. *Westview Investments, Ltd. v. U.S. Bank Nat. Ass'n*, 133 Wn. App. 835, 852, 138 P.3d 638 (2006). Circumstantial evidence can support a claim of conversion, so

9

long as inferences from the circumstantial evidence are reasonable. *See Arnold v. Sanstol*, 43 Wn.2d 94, 99, 260 P.2d 327 (1953).

From the evidence at trial, it was entirely reasonable to conclude Mr. Reilly was the person responsible for taking Mr. Douglass's cash-filled shoeboxes. Mr. Reilly had an ongoing practice of stealing from Mr. Douglass, he had unmonitored access to the shoeboxes at the time of the theft, and he exhibited suspicious knowledge about where to recover a portion of the stolen cash after the theft was complete.

In addition to its liability determination, the jury's loss calculation was justified by competent, nonspeculative evidence. A fair inference from the trial evidence was that the shoeboxes contained at least $1 million in cash. Of that sum, $357,252 was recovered. Subtracting the recovered funds from the original total, the jury's award of $605,148 was a conservative loss estimate. Given the manner in which Mr. Douglass had stored his money, mathematical precision was not required. *Kwik-Lok Corp. v. Pulse*, 41 Wn. App. 142, 150, 702 P.2d 1226 (1985). The jury's assessment must stand.

*Motion to bifurcate*

The trial court did not abuse its discretion in denying Mr. Reilly's motion to bifurcate the 2015 conversion claim (pertaining to the shoeboxes) from the other conversion claims. The earlier thefts were prior acts relevant to proving the 2015 theft

based on a common plan and motive. ER 404(b). Mr. Reilly complains that evidence of the pre-2015 acts of conversion was prejudicial. True enough. But the prejudice arises from the strong probative value of the pre-2015 acts, not any improper character implications. Because the prior acts were highly relevant to proving the theft of the 2015 conversion claim, joinder was proper. CR 42.[7]

*Violation of motion in limine and request for mistrial*

Although we agree with Mr. Reilly that Mr. Douglass's attorney improperly questioned Mr. Reilly's mother about the existence of criminal charges, the trial court did not abuse its discretion in denying the mistrial motion. Regardless of whether counsel's question violated an in limine order, the propriety of a new trial turned on the question of prejudice. *Aluminum Co. of America v. Aetna Cas. & Sur. Co.*, 140 Wn.2d 517, 540, 998 P.2d 856 (2000). Here, there was none. Counsel's improper question was an isolated incident in a lengthy trial. Mr. Reilly's objection was sustained and the subject was not explored further. There was uncontested trial evidence suggesting Mr. Reilly could face criminal charges, including testimony from the lead detective that Mr. Reilly was the only suspect who had not been ruled out as a possible perpetrator. Given the totality of these

---

[7] Prior act evidence is substantive evidence, not impeachment evidence. ER 609 is inapplicable.

circumstances, the lone impropriety attributed to Mr. Douglass's counsel did not deprive

Mr. Reilly of a fair trial. We will therefore respect the jury's verdict.

CONCLUSION

The judgment is affirmed. Mr. Reilly's request for attorney fees is denied.

A majority of the panel has determined this opinion will not be printed in

the Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____, C.J.
Pennell, C.J.

WE CONCUR:


_____
Korsmo, J.


_____
Fearing, J.